LINEMASTER SWITCH
CORPORATION,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

CLARK EQUIPMENT
COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

SCHLUMBERGER INDUSTRIES, INC.,
a/k/a Sangamo Weston, Inc.,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

Nos. 90–1253, 90–1262 and 90–1263.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 23, 1991.

Decided July 12, 1991.

Michael M. Meloy, Bala Cynwyd, Pa., with whom Sheila D. Jones and Randi L. Breslow were on the brief, Washington, D.C., for petitioner Clark Equipment Co. in 90–1262. Christopher J. Dunsky, Washington, D.C., also entered an appearance for petitioner.

R. Bradford Fawley, Hartford, Conn., for petitioner Linemaster Switch Corp. in 90–1253. Sherry W. Gilbert, Washington, D.C., also entered an appearance for petitioner.

Robert O. King, with whom L. Gray Geddie, Jr., Greenville, S.C., and James M. Kuszaj, Raleigh, N.C., were on the brief, for petitioner Schlumberger Industries, Inc. in 90–1263. Pamela E. Savage, Atlanta, Ga., Peter G. Nash, Washington, D.C., and Brian W. Curtis, II, Nashville, Tenn., also entered appearances for petitioner.

Eileen T. McDonough, Attorney, U.S. Dept. of Justice, and George Wyeth, Attorney, E.P.A., with whom Richard B. Stewart, Asst. Atty. Gen., and Earl Salo, Asst. Gen. Counsel, E.P.A., were on the brief, Washington, D.C., for respondent.

Byron L. Gregory, Louis M. Rundio, Jr., Chicago, Ill., and Donald R. Frederico, Boston, Mass., were on the brief for *amicus curiae* General Signal Corp., urging that the petitions for review be granted as to the joint statutory claim.

Before MIKVA, Chief Judge, and SILBERMAN and THOMAS, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Petitioners in these consolidated cases own sites that the Environmental Protection Agency (EPA) added to the National Priorities List (NPL), a compilation of hazardous waste sites considered to pose the greatest risk to human health and the environment, in February 1990. Petitioners jointly claim that EPA lacked authority to add sites to the NPL after October 1988, the date by which Congress had instructed the agency to revise its Hazard Ranking System (HRS) for evaluating potential NPL sites. Each petitioner also raises site-specific challenges to EPA's listing decisions. We conclude that EPA possessed authority to add sites to the NPL between October 1988 and the effective date of the belatedly revised HRS, and that EPA's inclusion of petitioners' sites on the NPL was neither arbitrary nor capricious.

## I. BACKGROUND

Section 105(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) requires the President, as part of a National Contingency Plan (NCP) for the removal of hazardous substances, to establish "criteria for determining priorities among releases or threatened releases" of hazardous substances, and to use those criteria to identify and list priority sites for remedial action. *See* 42 U.S.C. § 9605(a)(8)(A), (B) (1988). Congress instructed the President to revise the list of priority waste sites "no less often than annually." *See* 42 U.S.C. § 9605(a)(8)(B). EPA, to whom the President has delegated his statutory responsibility for the NCP, *see* 40 C.F.R. § 300.2 (1990), developed the Hazard Ranking System, a scientific model for estimating the human health and environmental risks posed by observed or threatened releases of hazardous substances, to evaluate sites being considered for inclusion on the NPL.

See 47 Fed.Reg. 31,180 (1982); 40 C.F.R. Part 300, App. A (1990) [hereinafter *1982 HRS* or *original HRS*]. We have discussed the functions, methodology, and application of the HRS at length in our prior opinions. *See, e.g., Eagle–Picher Industries v. EPA,* 759 F.2d 905 (D.C.Cir.1985) [*"Eagle–Picher I"*]; *Eagle–Picher Industries v. EPA,* 822 F.2d 132 (D.C.Cir.1987) [*"Eagle–Picher III"*]; *Stoughton v. EPA,* 858 F.2d 747 (D.C.Cir.1988).

Congress substantially revised CERCLA in the Superfund Amendments and Reauthorization Act of 1986 (SARA), PUB.L. No. 99–499, 100 Stat. 1613. SARA added a new subsection (c) to section 105 of CERCLA, requiring the President to amend the HRS to "assure, to the maximum extent feasible, that the hazard ranking system accurately assesses the relative degree of risk to human health and the environment posed by sites and facilities subject to review." 42 U.S.C. § 9605(c)(1). The provision further stated that:

> The President shall establish an effective date for the amended hazard ranking system which is not later than 24 months after October 17, 1986. Such amended hazard ranking system shall be applied to any site or facility to be newly listed on the National Priorities List after the effective date established by the President. ·Until such effective date of the regulations, the hazard ranking system in effect on September 1, 1984, shall continue in full force and effect.

*Id.*

EPA's revised HRS did not become effective until March 14, 1991—almost twenty-nine months after the October 17, 1988 deadline established by Congress. *See* 55 Fed.Reg. 51,532 (1990) (announcing promulgation of final HRS revisions). Between the October 1988 statutory deadline and the effective date of the amended HRS, however, EPA added seventy-one sites to the NPL using the criteria established in the 1982 HRS. *See* 55 Fed.Reg. 6154 (1990). Among those sites were facilities owned by petitioners Linemaster Switch Corp. (a manufacturing plant in Woodstock, Connecticut), Clark Equipment Co.

(the "Tyler Refrigeration Pit" in Smyrna, Delaware), and Schlumberger Industries, Inc. (the "Sangamo Weston, Inc./Twelve–Mile Creek/Lake Hartwell PCB Contamination Site" in Pickens, South Carolina). *See id.* at 6160–61.

## II. SECTION 105(c) CHALLENGE

Petitioners raise a joint statutory challenge to EPA's inclusion of their sites on the NPL. They claim that EPA lacked authority to add sites to the NPL pursuant to the 1982 HRS once the October 1988 deadline contained in section 105(c)(1) had passed. Petitioners argue that Congress' mandate was plain: EPA was to amend the HRS by October 1988 at the latest and apply the amended HRS to any site listed after the amendments' effective date. Consequently, they contend that this court must give effect to Congress' clear intent to preclude EPA from adding sites to the NPL after October 1988 except pursuant to an amended HRS.

We consider the statutory question to be significantly more complicated than petitioners suggest. Although section 105(c)(1) clearly instructs the President to revise the HRS by October 1988, it specifies no consequences for failure to comply with that deadline. *Cf.* 42 U.S.C. § 6924(g)(6) (Resource Conservation and Recovery Act specifies consequences of EPA's failure to meet deadline). The text of section 105(c)(1) thus offers no indication of what Congress intended in the event of EPA's non-compliance with the statutory mandate. Petitioners' claim that Congress intended to prohibit additions to the NPL altogether after October 17, 1988 until the amended HRS became effective is certainly plausible. Given section 105(a)(8)(B)'s command that the NPL be revised annually, however, it is also plausible that Congress would have wanted EPA to continue using the 1982 HRS until the amended HRS became effective—whatever that date might be.

■ We cannot agree with EPA's suggestion that we resolve this statutory ambiguity through resort to *Chevron* deference. *See Chevron U.S.A. Inc. v. Natural Re-*

*sources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Before we may defer to an agency's construction of a statute, we must find either explicit or implicit evidence of congressional intent to delegate interpretive authority. *See id.* at 843–44, 104 S.Ct. at 2781–82; *Kansas City v. Dep't of Housing and Urban Development,* 923 F.2d 188, 191–92 (D.C.Cir.1991). Section 105(c)(1) contains no such explicit delegation. Moreover, given the clarity of Congress' instruction that the HRS be revised no later than October 17, 1988, it would indeed be odd to conclude that Congress implicitly entrusted a laggard agency with the authority to devise a remedy for its own untimeliness.

■ Our own review of the legislative history surrounding section 105(c) suggests that Congress would not have wanted to revoke EPA's authority to list sites on the NPL after expiration of the statutory deadline. The nature of legislators' dissatisfaction with the 1982 HRS is of critical importance to our resolution of the statutory ambiguity. Through SARA, Congress sought to ensure that an amended HRS would "accurately assess[ ] the relative degree of risk" posed by potential NPL sites. *See* CERCLA § 105(c)(1); 42 U.S.C. § 9605(c)(1). Congress was troubled primarily by allegations that the 1982 HRS resulted in the listing of a disproportionate number of high volume, low toxicity hazardous waste sites—notably mining sites. *See, e.g.,* S.REP. No. 11, 99th Cong., 1st Sess. 40 (1985) (acknowledging possibility of "bias in the hazard ranking system against large quantities of waste with the presence of trace toxic metals, such as typical mining wastes"); H.R.REP. No. 962, 99th Cong., 2d Sess. 200 (1986) ("The review of the Hazard Ranking System needs to adequately consider the quantity, toxicity, and concentrations of hazardous constituents, which are present in any release...."); *Superfund Improvement Act of 1985: Hearings on S. 51 and S. 494 Before the Senate Comm. on Environment and Public Works,* 99th Cong., 1st Sess. 53 (1985) (comments of Sen. Simpson expressing concern about the effect of EPA's "hazardous waste ranking on min-

ing sites"); *id.* at 72 (EPA's written responses to Sen. Simpson's questions, acknowledging that "it may be possible to improve the way the HRS handles mining and non-mining sites," but rejecting "the contention that the HRS is unfairly placing mining sites on the NPL"); 131 CONG.REC. 24,078–79 (1985) (comments of Sen. Baucus, co-sponsor of amendment to section 105, explaining his mining-focused accuracy concerns with 1982 HRS). *See also Eagle-Picher I,* 759 F.2d at 921–22 (rejecting arbitrary and capricious challenge to 1982 HRS' treatment of mining sites); 48 Fed. Reg. 40,658, 40663 (1983) (preamble to NPL rejects commenters' suggestions that mining sites should not be included).

Congress devised an interim remedy to address this perceived flaw in the original HRS. Section 105(g) of CERCLA requires the President, "[p]ending revision of the hazard ranking system," to "consider" the "quantity, toxicity, and concentration of hazardous substances" before adding any site containing so-called "special study wastes" to the NPL. 42 U.S.C. § 9605(g)(2). The term "special study wastes" includes "[s]olid waste from the extraction, beneficiation, and processing of ores and minerals." *See* CERCLA § 105(g)(1)(B); 42 U.S.C. § 9605(g)(1)(B). *See also* 42 U.S.C. § 6921(b)(3)(A)(ii), (iii). By requiring EPA to make special findings before including sites that contain such wastes on the NPL, Congress allayed its immediate concerns about the accuracy of the 1982 HRS, rendering suspension of EPA's listing authority prior to promulgation of the amended HRS an unnecessary and drastic solution.

Our review of the legislative history reveals no other congressional concerns about the fairness of the original HRS to particular industries or parties. Instead, there are indications that Congress, having addressed its immediate mining-related problems with the HRS, did not intend to prevent EPA from continuing to list sites on the NPL after the October 1988 deadline had expired. For example, as even petitioners admit, Congress recognized the problems that could result from an inter-

ruption of EPA's listing authority. Highlighting the main provisions of the amendments to section 105, Senator Baucus, one of the co-sponsors, explained that "the existing hazard ranking system would continue in effect until the revised system is in place," and assured his colleagues that "the provision should not disrupt progress to clean up existing NPL sites or preclude EPA from listing new sites in the interim until the HRS is revised." *See* 131 CONG. REC. 24079 (1985) (emphasis added). Such concerns about disrupting EPA's remedial efforts suggest that Congress did not intend the drastic remedy of suspending the agency's listing authority pending revision of the HRS.

In addition, Senator Baucus, during floor debate, specifically addressed the possibility that EPA would fail to comply with the HRS amendment deadline; rather than suggesting that EPA's listing authority would thereafter be suspended, however, Senator Baucus stated that "if ignored by EPA, the requirements may be enforced by citizen suit." *See* 131 CONG.REC. 24,078 (1985). *See also* CERCLA § 310; 42 U.S.C. § 9659(a)(2) (permitting any citizen to bring a civil action against the President or EPA for failure to perform any non-discretionary duty); *Natural Resources Defense Council v. Train*, 510 F.2d 692, 704–05 (D.C.Cir.1974) (approving district court's establishment of alternative publication schedule to remedy EPA's failure to meet statutory deadline). The Senator's express recognition of citizen suits as a remedy for agency non-compliance makes it even less likely that more drastic consequences such as revocation of NPL listing authority were contemplated.

When taken together, these factors—the absence of any language in section 105(c)(1) revoking EPA's listing authority for failure to amend the HRS by the statutory deadline; the evidence indicating that Congress was primarily concerned about the original HRS' fairness towards high volume, low toxicity sites such as mines, a problem for which it devised a specific interim remedy; congressional concerns about disrupting EPA's remedial efforts; and the suggestions in SARA's legislative history that citi-

zen suits were explicitly considered to be a remedy for agency inaction—all leave us unwilling to conclude that Congress intended to suspend EPA's authority to list sites on the NPL between October 1988 and March 1991.

We are especially reluctant to so curb EPA's substantive authority in light of Supreme Court decisions declining to restrict agencies' powers when Congress has not indicated any intent to do so and has crafted less drastic remedies for the agency's failure to act. *See, e.g., General Motors Corp. v. United States*, —— U.S. ——, 110 S.Ct. 2528, 2534, 110 L.Ed.2d 480 (1990); *Brock v. Pierce County*, 476 U.S. 253, 260, 106 S.Ct. 1834, 1839, 90 L.Ed.2d 248 (1986). For example, in *Brock*, the Court refused to find that the Department of Labor lost its authority to recover misused funds after expiration of the 120–day period in which Congress had instructed the Department to make a final determination as to misuse. The Court noted the statute's silence regarding the consequences of agency non-compliance with the 120–day deadline, *see* 476 U.S. at 259, 106 S.Ct. at 1838, and explained:

> We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake. When, as here, there are less drastic remedies for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act.

*Id.* at 260, 106 S.Ct. at 1839 (footnote omitted). We believe that the strong public interest in EPA's ongoing identification of sites for NPL listing, combined with Congress' accommodation of the private interests potentially harmed by the original HRS and its contemplation of citizen suits as a remedy for EPA non-compliance, brings this case within the doctrine cited above.

We thus reject petitioners' statutory challenge to EPA's authority to list their hazardous waste sites on the NPL. Although we do not condone EPA's untimeli-

ness, we conclude that Congress intended the agency to continue listing sites pursuant to the 1982 HRS until the amended HRS became effective, even if that effective date was later than the section 105(c)(1) revision deadline. We turn now to petitioners' individual challenges to EPA's listing decisions.

### III. SITE-SPECIFIC CHALLENGES

#### A. *Linemaster Switch Site*

Petitioner Linemaster Switch manufactures electrical and pneumatic foot switches and wiring harnesses at its Woodstock, Connecticut plant. Groundwater sampling performed in early 1986 revealed the presence of arsenic, among other hazardous substances, at the plant. Application of the HRS to data from the site yielded a score of 33.71, substantially above the 28.50 cutoff EPA uses for NPL listing purposes. As a result, EPA proposed adding the Linemaster site to the NPL in June 1988, *see* 53 Fed.Reg. 23,988, 23,997 (1988), and the listing became final in February 1990. *See* 55 Fed.Reg. at 6161.

■ Linemaster alleges that EPA's decision to include the site on the NPL was arbitrary and capricious. Specifically, Linemaster contests EPA's reliance on what it deems outmoded preliminary data relating to arsenic levels at the site, as well as the agency's alleged refusal to consider more recent data. February 1986 samples used by EPA in scoring the site showed arsenic levels of 141 parts per billion (ppb) and 52 ppb in two on-site wells; as a result, arsenic was the highest scoring compound identified at the site in terms of toxicity and persistence. Linemaster points to data from August 1987 and June 1988 which it claims demonstrate that arsenic levels at the plant are actually between 20 and 40 ppb.

EPA does not deny the existence or question the validity of Linemaster's data. Instead, it claims that the information was not part of the administrative record relating to the NPL listing, and that EPA was therefore under no duty to consider it. *See*

EPA Response to Comments, NPL–FRU8–10–5, at 2–7 (noting that Linemaster failed to provide the agency with the "new hydrogeologic data" referenced in its comments, and that EPA therefore "cannot specifically address these data").

As a preliminary matter, we reject Linemaster's contention that this court's February 22, 1991 order permitting the company to supplement the judicial record with material that included the disputed arsenic data resolved the underlying question regarding the scope of the administrative record in Linemaster's favor. We have previously stated that reviewing courts should take into account "neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Memorial Hosp. v. Heckler,* 749 F.2d 788, 792 (D.C.Cir.1984). *See also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). We allowed Linemaster to supplement the record so that we could fully examine the parties' competing contentions concerning the scope of the administrative record; our order should not be construed to have so cursorily resolved an important question going to the merits of petitioner's claim. Having reviewed the disputed materials and the parties' contentions in greater detail, we now decline to construe the administrative record as broadly as petitioner invites.

The 1987–88 arsenic data was not part of the "administrative record that was before the [Administrator] at the time he made his decision," *Citizens to Preserve Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825, because Linemaster failed to submit the data to the proper division of EPA or even to flag it as relevant to the NPL listing process. Linemaster's hydrogeological engineers sent the August 1987 and June 1988 sampling results to EPA's Region I office in Boston pursuant to an unrelated administrative consent order between the company and the agency; Linemaster never submitted any of the data to EPA's Hazardous Site Evaluation Division, which was conducting the entirely separate NPL rulemaking proceeding in Washington, D.C.

and had invited comments thereon. *See* 53 Fed.Reg. at 23,988.

Linemaster cannot fairly complain that the location of its filing was a mere technicality, as EPA's comment procedures enable the agency to shoulder the weighty investigative burden that continual revision of the NPL entails. *See* 40 C.F.R. § 300.425(d)(5) (requiring EPA to solicit comments on proposed NPL additions and to respond to each significant comment received); 53 Fed.Reg. at 23,988 (instructing that comments on proposed listings be mailed to Hazardous Site Evaluation Division). We are therefore unwilling to hold that material submitted to an EPA regional office pursuant to a consent order is "before" the agency's Hazardous Site Evaluation Division for NPL listing purposes. Such a holding would effectively require EPA to comb all regional files for potentially relevant data before listing a site on the NPL, and would be inconsistent with our prior decisions emphasizing the necessarily abbreviated nature of the listing process and tolerating somewhat cursory agency actions and explanations in that context. *See Eagle–Picher Industries v. EPA,* 759 F.2d 922, 932 (D.C.Cir.1985) (describing the NPL as "simply a rough list of priorities, assembled quickly and inexpensively to comply with Congress' mandate for the agency to take action straightaway") [*Eagle–Picher II*]; *Stoughton,* 858 F.2d at 751.

Moreover, as this case aptly demonstrates, parties opposing inclusion of their sites on the NPL are well-positioned to supply EPA staff with any assertedly relevant data. Here, the August 1987 arsenic data had been available for at least ten months before Linemaster filed with the NPL staff its voluminous comments opposing listing (including thirty documents as an appendix), and the company even alluded to the data in its comments. In addition, since the June 1988 arsenic results were available at least by August 26, 1988, the date they were mailed to EPA's Region I office, Linemaster could have filed those results within three days of the close of EPA's August 23, 1988 NPL comment deadline. *See* 53 Fed.Reg. at 23,988 (estab-

lishing comment deadline); *id.* at 23,990 (announcing that EPA will continue to consider late-filed comments "to the extent practicable"). Finally, contrary to Linemaster's contention, its May 1987 request that EPA's Region I office incorporate all materials "as part of the administrative record of this proceeding" applied only to the consent order, *not* the NPL listing proceeding, as evidenced by Linemaster's citation to section 113(k) of CERCLA. *See* 42 U.S.C. § 9613(k) (establishment of administrative record for selection of response action).

We thus find that the 1987–88 arsenic data are not part of the administrative record for the NPL rulemaking proceeding and that the agency's reliance on the earlier findings was neither arbitrary nor capricious. We have reviewed Linemaster's remaining claims and conclude that they lack merit. Linemaster's petition for review is accordingly denied in its entirety.

### B.  *Tyler Refrigeration Site*

Between 1963 and 1976, the Tyler Refrigeration division of petitioner Clark Equipment Company operated a manufacturing facility in Smyrna, Delaware. The site contained an unlined leaching pit into which the company disposed liquid industrial wastes, but the pit was excavated, filled in, and paved over sometime prior to 1978, when the property was sold to its present owner. Smyrna's water supply was found to be contaminated with solvents, and state officials identified the Tyler site as a likely contributor. EPA originally proposed including the site on the NPL in 1986, *see* 51 Fed.Reg. 21,099, 21,107 (1986), and the site was finally listed in 1990. *See* 55 Fed.Reg. at 6161.

■ Clark raises several challenges to EPA's scoring of the Tyler Refrigeration site. First, Clark contends that EPA arbitrarily and capriciously failed to consider prior remedial activities performed by the company at the site, notably the excavation and filling of the waste lagoon. Yet we have previously approved EPA's policy of disregarding prior remedial actions in scor-

ing sites under the 1982 HRS. *See Eagle–Picher III*, 822 F.2d at 149 ("This court has already rejected the argument that the EPA must consider the effects of remedial measures in scoring a site under the Hazard Ranking System."); *Eagle–Picher I*, 759 F.2d at 921–22. *See also* EPA Response to Comments, NPL–FRU8–10–5, at 4–12 to 4–13 (explaining agency policy). Clark's efforts to distinguish sites such as Tyler at which remedial actions were taken prior to the enactment of CERCLA are simply unavailing in light of controlling circuit precedent.

■ Second, Clark contends that EPA miscalculated the waste quantity at the site and should have assigned that factor a "0" (no data available) or at most a "1" (quantity of waste unknown), instead of the "5" it actually received. *See* 40 C.F.R. Part 300, App. A, § 2.0 (general considerations), § 3.4 (waste characteristics); 53 Fed.Reg. 51,962, 51,972 (1988) (proposed revisions to HRS). We can find no error in EPA's calculations, however. Under the original HRS, EPA was not required to identify the exact quantity of hazardous substances at the site. Rather, EPA needed only to determine that some hazardous substances were present in the waste and then to estimate the total quantity of waste (i.e., the total volume of the pit). *See* 53 Fed. Reg. at 51,972 (explaining that under the original HRS "hazardous waste quantity is the amount of waste containing hazardous substances ... present at a site"); 49 Fed. Reg. 37,070, 37,077 (1984) (rejecting commenters' suggestions that EPA should exclude non-hazardous constituents in calculating waste quantity).

Information from a former Tyler Refrigeration employee, combined with soil sampling from the site, permitted the agency to conclude that hazardous substances were present in the waste. Estimates from the former employee and the firm that conducted the preliminary site assessment similarly enabled EPA to calculate the total volume of the pit, and therefore total waste quantity, as somewhere between 312 and 500 cubic yards. The HRS specifies a value of "5" where, as here, waste quantity

falls between 251 and 625 cubic yards. *See* 40 C.F.R. Part 300, App. A, § 3.4. Thus, we conclude that EPA correctly scored waste quantity at the site.

■ Finally, Clark's claim that EPA incorrectly estimated the size of the population at risk from groundwater contamination lacks merit, as the agency properly applied section 3.5 of the HRS and included within its calculation all people who draw water from wells located within three miles of the hazardous substances. *See* 40 C.F.R. Part 300, App. A, § 3.5. To the extent that Clark challenges EPA's use of formulas to estimate data, our prior cases are dispositive. *See Eagle–Picher III*, 822 F.2d at 146 (noting that petitioner's "challenge to the score given to population count in essence contests the Hazard Ranking System's preference for using formulas even where actual figures are available, a preference which we have already upheld"); *Eagle–Picher I*, 759 F.2d at 921–22.

Although we reject Clark's challenges to EPA's scoring of the Tyler Refrigeration site under the unamended HRS and therefore deny its petition for review, we acknowledge that EPA has changed several of the policies to which Clark objects. For example, under the amended HRS, the agency now considers prior remedial actions in calculating waste quantity at a site. *See* 55 Fed.Reg. at 51,567–68. In addition, the amended HRS contains a far more detailed methodology for determining hazardous waste quantity than the original HRS, requiring that separate values for hazardous constituent quantity, hazardous wastestream quantity, volume, and area be calculated at each site. *Compare* 40 C.F.R. Part 300, App. A, § 3.4 *with* 55 Fed.Reg. at 51,590–92. Although Congress clearly stated that sites listed on the NPL prior to the effective date of the amended HRS need not be reevaluated, *see* CERCLA § 105(c)(3), EPA has broad discretion in determining what remedial actions are warranted. *See* CERCLA § 104; 42 U.S.C. § 9604. We expect that EPA will carefully consider its current policies in developing a remedial plan for the Tyler Refrigeration site.

## C. *Sangamo Weston Site*

Schlumberger Industries operates the Sangamo Weston facility, a plant that manufactures electrical equipment near Pickens, South Carolina. Sangamo disposed of wastes on the property and released effluents into unnamed tributaries of Town Creek that originate on the property; Town Creek in turn flows into Twelve Mile Creek, which flows into Lake Hartwell. In addition, Sangamo disposed of wastes at various landfills in the area. After a preliminary assessment, EPA calculated an HRS score for the Sangamo plant that exceeded the NPL listing cutoff; the agency then aggregated the plant, the unnamed tributaries, Town Creek, Twelve Mile Creek, Lake Hartwell, and five private landfills into a single site on the NPL. *See* 55 Fed.Reg. at 6160.

■ Schlumberger claims that EPA lacked authority to aggregate sites for NPL listing purposes. Schlumberger notes that, unlike section 104(d)(4) of CERCLA, which explicitly authorizes EPA to aggregate facilities for remedial purposes, section 105(a)(8)(B), the provision requiring the agency to develop and update the NPL, is silent concerning aggregation. *Compare* 42 U.S.C. § 9605(a)(8)(B) *with* 42 U.S.C. § 9604(d)(4) ("Where two or more noncontiguous facilities are reasonably related on the basis of geography, or on the basis of threat ... to the public health or welfare or the environment, the President may, in his discretion, treat these related facilities as one for purposes of this section."). Schlumberger therefore concludes that EPA's long-standing policy of aggregating non-contiguous sites under the NPL is invalid. *See* 48 Fed.Reg. at 40,663–64 (describing EPA policy).

We conclude that Schlumberger waived this statutory challenge by failing to raise it during the rulemaking below. *See Washington Ass'n for Television and Children v. FCC*, 712 F.2d 677, 680 (D.C. Cir.1983) ("As a general rule, claims not presented to the agency may not be made for the first time to a reviewing court.") [hereinafter *WATCH*]. The comments that Schlumberger filed with EPA alleged only that the agency incorrectly and inconsistently applied its aggregation policy to the Sangamo site. *See* Comments Opposing Listing, NPL–U6–3–79–R4 (March 1987); *id.*, Executive Summary at 2 (alleging that EPA "failed to follow its own guidelines," and that "EPA's proposal is inconsistent with previous Agency decisions"); *id.*, Comments at i-iii (table of contents). In fact, Schlumberger assumed that section 104(d)(4) of CERCLA authorized EPA to aggregate sites for NPL listing purposes. *See id.*, Comments at 3 (stating that section 104(d)(4) of CERCLA "provides that two or more non-contiguous facilities *may be treated as one NPL site*" (emphasis added)).

We have recognized several exceptions to the general rule that claims not presented to an agency may not be raised for the first time before a reviewing court, *see WATCH*, 712 F.2d at 682; however, none of those would excuse Schlumberger's failure to present its claim to EPA. Nevertheless, Schlumberger contends that its claim that EPA lacked authority to aggregate sites for NPL purposes falls within an exception to the waiver doctrine for challenges to an agency's jurisdiction or power to act, as recognized in *Railroad Yardmasters of America v. Harris*, 721 F.2d 1332, 1338–39 (D.C.Cir.1983) (holding that petitioner's claim that the National Mediation Board lacked authority to act when two of its three seats were vacant was not waived).

Although some of the language in *Yardmasters* could be read to permit any statutory challenge to be raised for the first time in a judicial appeal, *see* 721 F.2d at 1338 ("The substantive issue here ... is solely one of statutory interpretation."), later cases have declined to construe the case or the underlying doctrine so broadly. In *Natural Resources Defense Council v. Thomas*, 805 F.2d 410, 428 (D.C.Cir.1986), we explained that *Yardmasters* "actually stands for the much narrower proposition that a challenge regarding the proper constitution of the agency, an unusual and limited type of attack, can be raised for the first time before a court." *See also National Recycling Coalition, Inc. v. Reilly*, 884 F.2d 1431, 1437 (D.C.Cir.1989). Schlumberger's claim does not fall within

this narrow category. Moreover, by excusing petitioners' failure to present statutory challenges to federal agencies for initial resolution, such an expansive view of the jurisdiction exception to the waiver doctrine would infringe on agencies' rightful role in statutory construction under the *Chevron* framework. We accordingly conclude that Schlumberger waived its claim that EPA lacked authority to aggregate sites for NPL purposes, and decline to reach the merits.

■ Schlumberger also raises several challenges to EPA's application of its aggregation policy in this case. We conclude that EPA's decision to aggregate the sites was neither arbitrary nor capricious. In particular, we reject Schlumberger's first contention that EPA's own policy requires the agency to find each of the factors mentioned therein satisfied before it may aggregate a site. *See* 48 Fed.Reg. at 40,663–64 ("Factors relevant to [an aggregation] determination include whether the two sites were part of the same operation . . ., whether contamination from the two sites are threatening the same ground water or surface water resource, . . . [and] the distance between the non-contiguous sites and whether the target population is essentially the same or substantially overlapping. . . ."). Rather, we believe that the policy statement contains a non-exhaustive list of factors relevant to, but not dispositive of, an aggregation question. *See id.* ("relevant" factors *"include . . . ."* (emphasis added)); 49 Fed.Reg. at 37,076 ("Factors relevant to such a determination *may include . . . ."*); EPA Response to Comments, NPL–FRU8–10–5, at 5–104.

■ We have considered Schlumberger's claims that the aggregated sites are not part of the same operation and do not threaten the same surface water, and conclude that they too lack merit. First, the same substances (polychlorinated biphenyls, or PCBs) were deposited at the aggregated sites by the same potentially responsible party (Sangamo Weston)—two factors that the aggregation policy notes are relevant in determining whether the sites are part of the "same operation." *See* 48 Fed. Reg. at 40,663. Schlumberger has failed to explain how possible differences in the

means of disposal at the various sites—another descriptive factor, *see id.*—are even relevant here, let alone sufficient to overcome the other two indicia of a similar operation. Second, as the aggregated sites are either water bodies that flow into Lake Hartwell or land-based facilities located adjacent to water bodies that flow into Lake Hartwell, EPA reasonably concluded that the sites all threaten the same "surface water resource." *See* 48 Fed.Reg. at 40,-664.

■ Finally, we reject Schlumberger's contention that EPA's decision to aggregate the Sangamo/Twelve Mile Creek/Lake Hartwell sites diverged from prior agency precedent. The examples of non-aggregated sites that Schlumberger describes in its brief are inapposite; most appear to entail multiple waste generators at each individual site, unlike those at issue here. In fact, EPA specifically excluded several municipal landfills from the proposed definition of the Sangamo aggregated site precisely because they entailed more than one potentially responsible party and contained more than one type of waste. *See* EPA Response to Comments, NPL–FRU8–10–5, at 5–107.

Schlumberger's petition for review is accordingly denied in its entirety.

## IV. Conclusion

We conclude that Congress did not intend to suspend EPA's authority to add sites to the NPL even though the agency failed to meet the statutory HRS amendment deadline, and therefore reject petitioners' joint claim that EPA lacked authority to add their sites to the NPL. We also reject petitioners' individual challenges to the listing of their sites on the NPL, as we conclude that (1) the administrative record did not include the arsenic data on which Linemaster seeks to rely; (2) in scoring the Tyler Refrigeration Site under the 1982 HRS, EPA properly declined to consider prior remedial actions and did not err in calculating the quantity of hazardous waste or the population at risk; and (3) Schlumberger waived its claim that EPA lacked authority to aggregate sites for NPL listing purposes, and EPA's application of the aggregation policy was neither

arbitrary nor capricious. The petitions for review are accordingly

*Denied.*