**WASHINGTON GAS LIGHT COMPANY, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent.**

**Office of the People's Counsel, Intervenor.**

**Nos. 08–AA–148, 08–AA–17.**

District of Columbia Court of Appeals.

Argued Sept. 29, 2008.
Decided Oct. 8, 2009.

Ketanji Brown Jackson, Washington, with whom Sherri N. Blount, Christopher George, Beth S. Brinkmann, Beverly J. Burke, Bernice K. McIntyre and Cathy Thurston–Seignious were on the briefs, for petitioner.

Christopher Lipscombe, with whom Richard A. Beverly, General Counsel of the District of Columbia Public Service Commission, was on the briefs, for respondent.

Jennifer L. Weberski, Assistant People's Counsel, with whom Elizabeth A. Noël, People's Counsel, Sandra Mattavous–Frye, Deputy People's Counsel, Laurence C. Daniels, Assistant People's Counsel, and Robert C. McDiarmid, Scott H. Strauss and Larissa A. Shamraj were on the briefs, for intervenor.

Before GLICKMAN and KRAMER, Associate Judges, and FARRELL, Senior Judge.*

GLICKMAN, Associate Judge:

This appeal concerns a $350,000 forfeiture levied by the D.C. Public Service Commission against Washington Gas Light Company (WGLC). On July 20, 2007, the Commission ordered WGLC to produce to it a copy of a contract WGLC had signed with a third party. When, in the opinion of the Commission, WGLC willfully and "egregious[ly]" failed to submit an unredacted copy of the contract, the Commission imposed the forfeiture, citing D.C.Code § 34–706(a) (2009 Supp.) as its primary source of authority to do so. WGLC applied for reconsideration. When its application was denied, the utility appealed, arguing that the Commission had acted arbitrarily and capriciously and denied it due process of law.

Following oral argument, we ordered the parties to submit supplemental briefs addressing several important legal issues. The first three questions we asked were substantive: (1) whether the Commission was constrained to use statutes that address discovery and disclosure failures more specifically than § 34–706(a) does; (2) whether § 34–706(a) creates a criminal or a civil penalty; and (3) whether the Commission may impose a § 34–706(a) forfeiture itself or must maintain an action in Superior Court to enforce the provision. Our fourth question was whether we are foreclosed from considering the first three, given the exhaustion requirements of D.C.Code § 34–604(b) (2001).

We address the last, threshold issue first. We hold that § 34–604(b) contains both jurisdictional and non-jurisdictional exhaustion requirements. In order for us to have subject-matter jurisdiction, the party petitioning for review of the Commission's order first must have filed an application for reconsideration. That done, we have jurisdiction to consider every issue the petitioner presents to us, regardless of whether it was raised before the Commission. The statute does, though, codify the judicial doctrine requiring parties to exhaust administrative remedies with respect to every issue. Therefore, we will not examine unex-

---

* Judge Farrell was an Associate Judge, Retired, at the time of the argument. His status changed to Senior Judge on January 23, 2009.

hausted issues unless extraordinary circumstances compel us to do so. In this case, we find that extraordinary circumstances would exist if, as WGLC argues, the Commission lacked the adjudicatory authority to impose the forfeiture.

Turning to the merits of that question, D.C.Code § 34–706(a) establishes a forfeiture penalty for certain violations of the Public Utilities Act or Commission or court orders. Our examination of the language, history and statutory context of that provision convinces us that the Commission lacks the authority to adjudicate those violations and impose the forfeiture penalty itself. Rather, the Commission is obliged to maintain an action in Superior Court in order to enforce § 34–706(a) and recover a forfeiture penalty. Because we conclude that the Commission was without authority to impose the $350,000 forfeiture on WGLC in this case, we reverse its order.

## I. Factual Background

In late 2006, WGLC applied to the Commission for permission to raise its rates to District of Columbia consumers. While the rate proceeding was pending in the summer of 2007, WGLC entered into an agreement with Accenture LLP to "provide business process outsourcing and service and technology enhancements." In exchange, WGLC agreed to pay Accenture $350 million. The contract between WGLC and Accenture was nominally 75 pages long, but appendices and exhibits stretched its length to 600 pages. The D.C. Office of People's Counsel (OPC), which represents ratepayers and is an intervenor in this appeal, sought a copy of the contract. So did the Office and Professional Employees International Union Local 2 (OPEIU), which represents some of WGLC's employees. And one week before the rate making hearing was to be held, the Commission filed its Data Request No. 4, which sought "a copy of the executed agreement" between WGLC and Accenture.

WGLC, however, permitted OPC and OPEIU to view only a portion of the contract. It held back certain attachments or exhibits, explaining to the Commission that:

[t]he Accenture contract includes proprietary Service Provider information for which Washington Gas has a mutual Non–Disclosure Agreement in place. In addition due to public disclosure requirements the Company is unable to allow copies of the document. However, [Commission] Staff may view the information at Washington Gas's ... offices, or the Company is willing to bring the documents to the Commission for viewing.

OPC filed a motion to compel immediate production of the entire contract, citing the impending rate making hearing.

On the Friday before the Monday on which the rate making hearing was to take place, the Commission entered two orders. Order No. 14,383 "direct[ed] [WGLC] to file its responses to the Commission's Data Request ... No. 4 by 9:00 a.m., Monday, July 23, 2007." The Order also warned WGLC that the Commission was "concerned with [WGLC's] failure to provide information to the Commission and the parties as requested in the discovery phase of this proceeding. Accordingly, any subsequent failure by [WGLC] to comply with the lawful directives of the Commission may result in a show cause order and or fine." The second order, No. 14,384, granted in part OPC's motion to compel, finding it in general "well founded." Nevertheless, it acknowledged WGLC's claims of privilege as to certain portions of the Accenture contract and so gave the utility a choice—"to produce its records to OPC

or deliver them to the Commission Secretary's Office, for *in camera* inspection by 12 noon on Saturday, July 21, 2007."

WGLC chose the latter path. On July 21, it submitted a copy of "the Confidential Master Services Agreement between Accenture and Washington Gas that contains the critical features of the relationship between the parties (75 pages)." It also submitted two exhibits, A.1 and A.6. Finally, it stated that "[t]here are other exhibits and attachments to the [contract] that are not related to the significant issues in this case.... If however, the Commission wishes to review *in camera* exhibits and appendices referred to in the [contract], Washington Gas will make those documents available to the Commission." Apparently to justify its withholding of some documents, WGLC insisted that Securities and Exchange Commission Fair Disclosure regulations prevented it from "making selective disclosures" of the contract. It also claimed that "it is not appropriate—and not necessary to the vigorous airing of the issues in the rate case—to provide the parties with actual copies of the documents." WGLC did not submit any further documents on Monday, July 23.

On that Monday, just before the rate making hearing began, the Commission entered Order No. 14,385, granting in part and denying in part OPC's and OPEIU's motions to compel. The Commission determined that WGLC's reasons for withholding the contract were insufficient, and so ordered that "[t]he whole [contract], including all of its Appendices ... must be produced in discovery by WGL for the Commission, OPC and OPEIU." It continued to issue "a protective order ... intended to ensure the confidentiality of the [contract]." Therefore, WGLC was required to "submit these records to OPC, OPEIU, and the Commission Secretary's Office by 5:00 p.m. today, Monday, July 23, 2007."

The rate making hearing did not go forward. After briefly reviewing the Commission's new order during a recess, WGLC contended that there was no basis for OPC's argument that the contract affected the rate change it sought. The chair of the Commission interjected: "[T]he Commission also asked for a copy of the contract. It's just not OPC. It's OPC, it is the Commission, and it is the order." WGLC's counsel responded, "I understand that," but continued to argue that the contract was irrelevant and its disclosure was barred by the SEC fair disclosure regulations. WGLC then announced its intent to move for reconsideration of Order No. 14,385. In response, OPC orally moved for a stay of the rate case, arguing that WGLC's foot-dragging was a deliberate litigation strategy. OPC also orally requested sanctions against WGLC, though it did not specify what type of sanctions it thought should be imposed. The Commission heard a response from WGLC, then indefinitely adjourned the hearing. Just before doing so, however, it also ordered the company to show cause why the rate case should not be dismissed for failure to produce the Accenture contract.

Rather than submit the complete contract, WGLC moved to reconsider Order No. 14,385, arguing that it had been given insufficient opportunity to object to the production requests and that the material was proprietary and confidential. The Commission responded with a brief order asking for responses from OPC and OPEIU and directing WGLC to "file its response to the ... oral motion of [OPC] to stay the proceedings and for sanctions for failure to produce information" to the Commission. WGLC responded on July 27. It contended that the sanctions mo-

tion was "totally without merit" and that dismissing the case would result in higher costs for customers.

The Commission took the motions— WGLC's motion for reconsideration and OPC's motion for a stay and for sanctions—under advisement. Ordinarily, it would have been required to decide the motion to reconsider within thirty days.[1] On August 17, 2007, however, it issued a "tolling order," stating that it needed additional time to fully consider the issues presented by the parties.[2] It later issued a similar second tolling order to give itself an additional five days.

On September 28, 2007, the Commission issued its decision. It denied WGLC's motion for reconsideration, "issue[d] a strengthened protective order," and stayed the rate proceeding indefinitely. It found that WGLC's due process concerns were unfounded, because it "had ample opportunity to raise objections to discovery and . . ., in fact, repeatedly [did] so." It also found that any procedural defects were "effectively cured by [the Commission's] consideration of the objections raised in the motion for reconsideration." Substantively, it held that the Accenture contract was relevant because it was necessary for the parties to be able to address whether the "outsourcing arrangement would impair the quality and reliability of service to customers." The Commission also found that WGLC was attempting to recoup some outsourcing-related costs in its rate application.

Simultaneously, the Commission issued a second order granting the OPC's motion for sanctions. It stated that under D.C.Code § 34–907 (2001), it had "broad and unfettered authority to require any public utility to produce any and all contracts." Two of its previous orders, Nos. 14,383 and 14,384, had "compelled [WGLC] to produce the [contract] for the Commission's review." WGLC had not done so, since it had withheld some of the contract appendices. Consequently, the Commission found "clear violations" of its orders. It noted that under D.C.Code § 34–706(a), "[i]f any public utility . . . shall fail, neglect, or refuse to obey any lawful requirement or order made by the Commission, . . . such public utility shall forfeit and pay to the District of Columbia the sum of $5,000 for each such offense." Furthermore, since D.C.Code § 34–708 (2001) provides that "[e]very day during which any public utility . . . shall fail knowingly or willfully to observe and comply with any order or direction of the Commission . . . shall constitute a separate and distinct violation of such order, or direction, or of this subtitle, as the case may be," the Commission found that each of the seventy days between July 21 and September 28 was a separate violation. Therefore, it calculated, WGLC was to forfeit $350,000.

WGLC immediately moved for reconsideration of the sanction order. It argued that its failure to submit the complete agreement was in good faith, as it thought it had complied with Orders No. 14,383 and No. 14,384. It argued that it thought Order No. 14,384 only directed it to produce the documents that previously had been available at its office (which were a

---

1. *See* D.C.Code § 34–604(b) (2001) ("The Commission, within 30 days after the filing of such application [for reconsideration], shall either grant or deny it.").

2. *See United States v. Pub. Serv. Comm'n of District of Columbia,* 465 A.2d 829, 834 (D.C. 1983) ("We see no reason not to allow the Public Service Commission . . . extended time for reasoned and deliberate consideration of applications for reconsideration. We find that the Public Service Commission acted lawfully in the circumstances presented by this complex case.").

subset of the documents actually constituting the contract.) Those documents were indeed delivered to the Commission by the deadline on Saturday, July 21. It also thought the same submissions satisfied the production directed in Order No. 14,383. WGLC further argued that the orders to produce the documents were, in effect, stayed by virtue of the company's motion to reconsider Order No. 14,385. In WGLC's view, Order No. 14,385 superseded the previous orders because it dealt with materially identical discovery issues. Finally, WGLC contended that it had no idea that the "clock was ticking" on an outstanding obligation, giving it no chance to mitigate the sanctions. The Commission denied the application for reconsideration and WGLC filed this timely appeal.

In its opening brief to this Court, WGLC raised two principal arguments. First, it claimed that the Commission denied it due process of law by the manner in which it imposed the $350,000 forfeiture sanction. Second, WGLC argued that the Commission lacked substantial evidence for its finding, required for the per diem multiplier under D.C.Code § 34–708, that WGLC's violation was "knowing or willful." As noted above, we raised several additional issues in a supplemental briefing order after oral argument. We now turn to the question of whether we may consider those issues, given WGLC's failure to raise them before the Commission.

## II. The Threshold Issues

D.C.Code § 34–605(a) (2001) gives us jurisdiction over appeals from the Commission's orders. It also dictates the procedure for appealing:

> Any public utility or any other person or corporation affected by any final order

or decision of the Commission ... may, within 60 days after final action by the Commission upon the petition for reconsideration, file with the Clerk of the District of Columbia Court of Appeals a petition of appeal setting forth the reasons for such appeal and the relief sought. ...

The "petition for reconsideration" is more fully explained in D.C.Code § 34–604(b). Section 604(b) provides:

> Any public utility or any other person or corporation affected by any final order or decision of the Commission may, within 30 days after the publication thereof, file with the Commission an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors claimed as grounds for such reconsideration. No public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application. ... No appeal shall lie from any order of the Commission unless an application for reconsideration shall have been first made and determined.[3]

On its face, § 604(b) appears to bar WGLC from seeking relief based on any of the three substantive legal grounds we raised in the supplemental briefing order, since those issues were "ground[s] not ... set forth in" its application for reconsideration.

WGLC contends, however, that in appropriate circumstances, we should recognize exceptions to § 604(b)'s rule, such as when allowing the Commission's order to stand would cause a miscarriage of justice or when the order exceeded the Commission's statutory authority. The Commission retorts that § 604(b) makes

---

**3.** *See also* 15 DCMR § 140.2 (2009) ("Applications for reconsideration or modification shall set forth specifically the grounds on which the applicant considers the order or decision of the Commission to be unlawful or erroneous.").

exhaustion of every issue a jurisdictional prerequisite, so we lack the power to hear and decide an issue not raised to the agency. And OPC argues that if exceptions exist from the strictures of § 604(b), WGLC has failed to show that this case merits their application.

The debate thus turns on two distinct questions—whether we *can* consider new issues, raised before us for the first time, and whether we *will* do so. Whether we have the power to consider them depends on the nature of § 604(b)'s command that no appellant may "urge or rely on any ground not ... set forth" in its application for reconsideration.[4] If this issue-exhaustion requirement is a jurisdictional prerequisite, we lack the authority to consider the issues raised in the supplemental briefing order. After careful consideration, though, we do not think that it is. While we agree that failure to file an application for reconsideration before the Commission would divest us of jurisdiction to hear the appeal, we read § 604(b)'s issue-exhaustion requirement as merely a codification of the common-law doctrine of exhaustion.

■ Although we therefore have the jurisdiction to entertain new issues, that does not necessarily mean we will consider them. Section 604(b)'s exhaustion require-

ment is not to be taken lightly. We have recognized, however, that if an alleged defect in an agency's jurisdiction is so serious that it wholly deprives the agency of the power to act, we retain the discretion to reach the jurisdictional question notwithstanding a party's failure to raise it before the agency. The third issue raised in our supplemental briefing order meets that high standard.[5] If D.C.Code § 34–706(a) only creates a cause of action on which the Commission may sue in Superior Court, then the Commission was wholly without power to adjudicate a violation of its orders itself and impose a $350,000 forfeiture under color of that statute. We therefore will reach the merits of that issue.

### A. The Statutory Exhaustion Requirements and Appellate Jurisdiction

■ On its face, D.C.Code § 34–604(b) is a requirement to exhaust administrative remedies by filing an application for reconsideration. It also requires the application to include, and thereby exhaust, every issue the party wishes to appeal. But as the D.C. Circuit has explained,[6] and as we have recognized,[7] there are several "distinct legal concepts" that

---

**4.** OPC argues that our ability to raise new issues is also diminished by D.C.Code § 34–605(a), which provides that we "may require and direct the Commission to receive additional evidence upon any subject relating to the issues on ... appeal." The questions we raise, though, are purely ones of law and do not require submission of any additional evidence, so § 605(a) does not pertain. *Cf.* D.C.Code § 34–606 (2001) ("In the determination of any appeal from an order or decision of the Commission the review by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.").

**5.** We note, without deciding, that the second issue may meet that standard as well. WGLC concedes that the statute creates a civil penalty, however. For that reason, and because we conclude that the Commission lacks adjudicatory authority under § 706(a), we need not reach the second issue.

**6.** *See Avocados Plus Inc. v. Veneman,* 361 U.S.App. D.C. 519, 523, 370 F.3d 1243, 1247 (2004).

**7.** *See District of Columbia v. Craig,* 930 A.2d 946, 955–56 (D.C.2007) (quoting *Avocados Plus* with approval and discussing it).

go by the name of "exhaustion." Which of those concepts § 604(b) embodies is a question requiring close analysis.

 The first type of exhaustion requirement is a common-law doctrine applicable whenever administrative remedies are available.[8] The doctrine serves several important policy functions: it prevents litigants from evading the agency's authority, thereby safeguarding the intent of the legislature in creating the agency; it protects agency authority by ensuring that the agency has the opportunity to apply its expertise and exercise its discretion; it aids judicial review by creating a record and promotes judicial economy by channeling claims to the decision maker of the legislature's choice.[9] However, because the doctrine is a discretionary rule derived from equity, it allows for some flexibility.[10] In certain exceptional circumstances, the court will waive the exhaustion requirement.[11] And while the doctrine is generally applied where no statute requires the litigant to exhaust its remedies, federal courts sometimes have interpreted statutes as merely codifying the common-law doctrine.[12]

 Second, some statutory exhaustion requirements "require[ ] resort to the administrative process as a predicate to judicial review."[13] In those cases, it is not the court's own prudential doctrine that requires exhaustion. Rather, Congress has exercised its power to control the jurisdiction of the court and has precluded from its review those cases in which the appellant failed to exhaust.[14] Courts are reluctant to find such jurisdictional bars, however. Even a statute expressly requiring exhaustion is considered non-jurisdictional "unless Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision."[15] But if the statute does create such a jurisdictional bar, the court cannot excuse a failure to exhaust; it has no jurisdiction to do so.[16]

Finally, at least one federal statute adopts an intermediate position: while the exhaustion requirement is not jurisdictional, as a matter of statutory interpretation it does not admit of any (or at least not the full range of) exceptions.[17] Still, because

---

8. *Avocados Plus,* 361 U.S.App. D.C. at 523, 370 F.3d at 1247.

9. *See Gilmore v. Bd. of Trs. of the Univ. of the District of Columbia,* 695 A.2d 1164, 1166 (D.C.1997) (quoting *Andrade v. Lauer,* 234 U.S.App. D.C. 384, 393, 729 F.2d 1475, 1484 (1984)).

10. *See, e.g., Barnett v. District of Columbia Dep't of Employment Servs.,* 491 A.2d 1156, 1160–61 (D.C.1985).

11. *See, e.g., Riverside Hosp. v. District of Columbia Dep't of Health,* 944 A.2d 1098, 1109 (D.C.2008); *Avocados Plus,* 361 U.S.App. D.C. at 523, 370 F.3d at 1247 (collecting cases).

12. *See, e.g., McBride Cotton and Cattle Corp. v. Veneman,* 290 F.3d 973, 980 (9th Cir.2002) (discussing 7 U.S.C. § 6912(e)); *Washington Ass'n for Television and Children v. FCC,* 229 U.S.App. D.C. 363, 367–69, 712 F.2d 677, 681–83 (1983) (discussing 47 U.S.C. § 405).

13. *Avocados Plus,* 361 U.S.App. D.C. at 523, 370 F.3d at 1247.

14. *Id.; District of Columbia v. Craig,* 930 A.2d 946, 956 (D.C.2007).

15. *Id.,* 361 U.S.App. D.C. at 524, 370 F.3d at 1248 (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.,* 234 U.S.App. D.C. 105, 109, 727 F.2d 1204, 1208 (1984) (internal quotation marks omitted)).

16. *See id.,* 361 U.S.App. D.C. at 523–24, 370 F.3d at 1247–48 (citing *Shalala v. Illinois Council on Long Term Care,* 529 U.S. 1, 13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000)); *Craig,* 930 A.2d at 956.

17. *See Booth v. Churner,* 532 U.S. 731, 740–41 & n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (unanimous opinion) (rejecting exception to Prison Litigation Reform Act require-

the requirement is not jurisdictional, it can be waived by the agency.[18]

Where in this spectrum § 604(b)'s issue-exhaustion requirement falls is a matter of first impression. To be sure, we repeatedly have stated in dicta that we would lack jurisdiction if a party petitioned for review of a Commission order without first having filed an application for reconsideration.[19] While we also (at least twice) have applied the issue-exhaustion requirement in declining to reach an issue raised for the first time on appeal from the Commission, we have never expressly held the requirement to be jurisdictional.[20]

The present case therefore requires us to examine afresh the nature of the issue-exhaustion bar § 604(b) imposes. In doing so, we will take care to label as "jurisdictional" only a requirement that actually is.[21] Our analysis is a matter of statutory interpretation,[22] so we first look to the plain language and ordinary meaning of the statute.[23] Ordinarily, that will control. We look to secondary sources, such as legislative history, only when the provision at issue defies straightforward interpretation.[24] And while we will defer

ment where prisoner sought only money damages and administrative remedies could not provide such compensation, and suggesting, though not holding, "[w]ithout getting into the force of this claim generally, we stress the point ... that we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise").

18. See, e.g., Jones v. Bock, 549 U.S. 199, 216–17, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (holding that "failure to exhaust is an affirmative defense under the [Prison Litigation Reform Act], and that inmates are not required to specially plead or demonstrate exhaustion in their complaints").

19. See Watergate Improvement Assocs. v. Pub. Serv. Comm'n, 326 A.2d 778, 781 n. 4 (D.C. 1974) (stating, in case in which application for reconsideration was filed, that "[a] request for reconsideration is a jurisdictional prerequisite to filing a petition of appeal"); Goodman v. Pub. Serv. Comm'n, 309 A.2d 97, 100 n. 2 (D.C.1973) (same). See also King v. Pub. Serv. Comm'n, 963 A.2d 140, 140 (D.C.2008) (per curiam) (stating, in case in which application was filed late and was denied as untimely, that "the statutory requirement to file a petition for reconsideration from an adverse decision is jurisdictional"); People's Counsel of District of Columbia v. Pub. Serv. Comm'n, 414 A.2d 520, 521 n. 3 (D.C.1980) (stating, in case in which application was filed, that request for reconsideration is a "condition precedent to any appeal," and that § 604 "is mandatory and jurisdictional," citing Watergate Improvement Assocs. and Goodman).

20. See District of Columbia v. Pub. Serv. Comm'n, 802 A.2d 373, 382 n. 15 (D.C.2002) ("District of Columbia law states that '[no public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application for reconsideration]).' Therefore, [the petitioner] is barred from raising this argument on appeal when it was not part of its application for reconsideration." (quoting § 604(b)) (citation omitted) (first two alterations in original); D.C. Tel. Answering Serv. Comm. v. Pub. Serv. Comm'n, 476 A.2d 1113, 1121 (D.C.1984) ("Because [the petitioner] did not raise the asserted lack of substantial evidence in its petition for reconsideration, it is unnecessary for us to address the argument here)." (citing § 604(b)).

21. See Kontrick v. Ryan, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

22. See, e.g., Avocados Plus, 361 U.S.App. D.C. at 523, 370 F.3d at 1247.

23. See, e.g., Beaner v. United States, 845 A.2d 525, 534 (D.C.2004).

24. See, e.g., United States v. Young, 376 A.2d 809, 813 (D.C.1977) ("If the meaning of a statute is plain on its face, resort to legislative

to an agency's reasonable interpretation of an ambiguous statute the legislature has charged the agency with administering,[25] that principle does not apply here. The Commission may have the power to require particular procedures for filing an application for reconsideration under § 604(b), but insofar as the statute implicates this Court's power to review the Commission's decision, this Court and not the Commission "administers" the statute.[26]

We consider first § 604(b)'s instruction to file an application for reconsideration before taking an appeal. It provides: "No appeal shall lie from any order of the Commission unless an application for reconsideration shall have been first made and determined." Similarly, D.C.Code § 34–605(a) states that a petition for appeal may be filed "within 60 days after final action by the Commission upon the petition for reconsideration," implying that an appeal can only be taken once a petition for reconsideration has been made and decided. The ordinary meaning of both provisions is that unless the application for reconsideration has been filed and decided, we cannot hear or decide the case.[27] By restricting when an appeal "lies" and when the petition for appeal may be filed, §§ 604(b) and 605(a) affect when an appeal validly exists. The clauses are "sweeping and direct;"[28] they implicate the power of the court;[29] they are clear and unequivocal.[30] Unless a party before the Commission files an application for reconsideration, we lack jurisdiction to hear the appeal.[31]

history or other extrinsic aids to assist in its interpretation is not necessary.").

**25.** See, e.g., Kabel v. District of Columbia Bd. of Elections and Ethics, 962 A.2d 919, 921 (D.C.2008).

**26.** See EEOC v. Lutheran Soc. Serv., 337 U.S.App. D.C. 373, 377–78, 186 F.3d 959, 963–64 (1999) (rejecting proposition that agency regulations regarding exhaustion can affect court's jurisdiction). But cf. King v. Pub. Serv. Comm'n, 963 A.2d 140, 140 (D.C. 2008) (per curiam) ("[I]t is a familiar principle that an agency's interpretation of a pertinent statute ... is entitled to deference when reviewed by an appellate court. Thus, this court has consistently upheld the Commission's interpretation that the statutory requirement to file a petition for reconsideration from an adverse decision is jurisdictional." (citation omitted)).

**27.** Cf. Serfass v. United States, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975) (discussing existence of appellate jurisdiction under 18 U.S.C. § 3731, which provides that in criminal cases, "an appeal by the United States shall lie to a court of appeals ... except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution" (emphasis added)); Wilentz v. Sovereign Camp, W.O.W., 306 U.S. 573, 582, 59 S.Ct. 709, 83 L.Ed. 994 (1939) ("As the case was not one for which a court of three judges is prescribed by [statute], no appeal lies to this Court and it is without jurisdiction to hear the merits of the appeal." (emphasis added)).

**28.** See Hettinga v. United States, 385 U.S.App. D.C. 168, 173, 560 F.3d 498, 503 (2009) (quoting Avocados Plus Inc. v. Veneman, 361 U.S.App. D.C. 519, 525, 370 F.3d 1243, 1248 (2004)).

**29.** See McBride Cotton and Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir.2002).

**30.** Avocados Plus, 361 U.S.App. D.C. at 524, 370 F.3d at 1248.

**31.** We reached a similar conclusion in District of Columbia v. Craig, 930 A.2d 946 (D.C. 2007). The statute at issue in that case, D.C.Code § 47–825.01(j–1) (2005), permitted property owners to appeal assessments and classifications in Superior Court "provided, that ... the owner shall have first appealed in good faith the assessed value or classification to the Board [of Real Property Assessments and Appeals] immediately preceding the appeal to the Superior Court...." We held that this statute "mandates use of administrative remedies as a jurisdictional prerequisite." 930 A.2d at 956.

In this case, WGLC did file an application for reconsideration, which the Commission denied; the jurisdictional clauses discussed above appear to be satisfied. But WGLC's application did not include the issues raised by this court in our supplemental briefing order, so we also must examine whether § 604(b)'s issue-exhaustion bar is jurisdictional. It states, "[n]o public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application." At first glance, this sentence also appears to contain "sweeping and direct" language, and it is certainly a plain command that litigants who wish to appeal must exhaust every issue before the Commission. Its syntax is similar—though not identical—to that of several federal statutes that do create a jurisdictional bar. The statute governing judicial review of orders by the National Labor Relations Board, for example, states that "[n]o objection that has not been urged before the Board ..., shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." [32] The Supreme Court has stated tersely that the petitioner's failure to "object[ ] to [an aspect of] the Board's decision in a petition

for reconsideration or rehearing ... prevents consideration of the question by the courts." [33] Several other statutes with nearly identical language likewise have been interpreted to create jurisdictional bars. [34] Of those, the closest linguistically to § 604(b) is 15 U.S.C. § 77i(a). That statute provides, "No objection to [an] order of the [Securities and Exchange] Commission shall be considered by the court unless such objection shall have been urged before the [SEC]." Like § 604(b), but unlike the other federal statutes, § 77i(a) does not allow exceptions in certain circumstances. [35] In a recent decision, *Zacharias v. SEC*, the D.C. Circuit held that § 77i(a) creates a jurisdictional bar. [36]

■ There is, however, one key difference between those federal statutes and D.C.Code § 34–604(b). The federal statutes each dictate that an objection not raised to the agency "shall [not] be considered by the court." [37] Section 604(b) instead provides that "[n]o ... *person* ... shall urge" a ground before a court that was not raised before the Commission. (Emphasis added.) This is not merely a semantic distinction. In deciding that 5 U.S.C. § 7123(c) creates a jurisdictional bar, the Supreme Court found it significant that the statute "speaks to courts, not

**32.** 29 U.S.C. § 160(e).

**33.** *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982).

**34.** A few years after *Woelke & Romero Framing*, the Supreme Court construed 5 U.S.C. § 7123(c), which has nearly identical language, to create a jurisdictional bar. *See EEOC v. FLRA*, 476 U.S. 19, 23–24, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986). And in *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 277 U.S.App. D.C. 350, 353–54, 876 F.2d 109, 112–13 (1989), the D.C. Circuit applied *Woelke & Romero Framing* and *EEOC v. FLRA* to determine that similar language in 16 U.S.C. § 825*l* (b) also

establishes a jurisdictional bar. The Supreme Court did not address the implication of an exception.

**35.** *Compare* D.C.Code § 604(b) (no exception stated), *and* 15 U.S.C. § 77i(a) (same), *with* 29 U.S.C. § 160(e) (allowing exception in "extraordinary circumstances"), *and* 5 U.S.C. § 7123(c) (same), *and with* 16 U.S.C. § 825*l* (b) (allowing exception where "there is reasonable ground for failure" to raise the objection in the application for rehearing).

**36.** 386 U.S.App.D.C. 301, 569 F.3d 458, 472 (2009).

**37.** *See* 5 U.S.C. § 7123(c); 15 U.S.C. § 77i(a); 16 U.S.C. § 825*l* (b); 29 U.S.C. § 160(e).

parties." [38] And taking the plain meaning of the words, a limitation on a party's ability to plead an error is not the same as a limitation on this Court's power to consider the same error. To illustrate, one might consider a hypothetical case in which a party raises an issue for the first time on appeal to us, but the Commission does not argue that we should not decide the new issue. Nothing in § 604(b) appears to prevent us from deciding that matter—we would simply apply our general rule that a party can "waive a waiver argument." [39]

Under this reading, though, § 604(b) creates both a jurisdictional requirement to exhaust *remedies* and a non-jurisdictional requirement to exhaust *issues*—an arguably anomalous dichotomy, since Congress placed the two requirements nearly side-by-side and obviously intended them to dovetail. To some extent, the legislative history may be read to suggest that the issue-exhaustion rule should be read as jurisdictional, resolving that inconsistency. Before Congress amended the law to create the current § 604(b), utilities had the right to bring a suit in equity to retry the Commission's conclusions. [40] Fed up with the delay and expense of the retrials, Congress aimed to narrow the scope of judicial review. [41] As originally drafted, the bill

merely required that an application for reconsideration be filed before the appeal was taken. The District's corporation counsel at the time, E. Barrett Prettyman, whom the D.C. Public Utilities Act made the Commission's legal counsel, [42] argued to the Committee on the District of Columbia:

[The draft bill] provide[s] for an application for reconsideration as a preliminary request to an appeal from an order of the Commission. In the draft, as printed, however, there is no requirement that the grounds of the appeal must be the same as the grounds in the motion for reconsideration. In other words, under this printed draft, so long as there is an application for reconsideration, there can then be an appeal but there is no mandatory hook-up on the grounds between the appeal and the application for reconsideration.

We want an amendment ... to insert a new sentence, which would read:

No public utility or other person or corporation shall in any court urge or rely on any ground not set forth in said application. [43]

Prettyman's request was granted.

That evidence for a jurisdictional reading is weaker on closer examination.

---

**38.** *EEOC v. FLRA,* 476 U.S. at 23, 106 S.ct. 1678.

**39.** *See In re T.L.,* 859 A.2d 1087, 1090 n. 6 (D.C.2004) (quoting *United States v. Delgado–Garcia,* 362 U.S.App. D.C. 512, 515, 374 F.3d 1337, 1340 (2004)).

**40.** *See* Act of March 14, 1913, Pub.L. No. 62–435, § 8, para. 64, 37 Stat. 938, 988 [hereinafter D.C. Public Utilities Act] ("[A]ny public utility ... dissatisfied with any order or decision of the [C]ommission ... may commence a proceeding in equity in the Supreme Court of the District of Columbia against the [C]ommission, as defendants, to vacate, set aside, or modify any such decision or order on the

ground that ... such order is unlawful, inadequate, or unreasonable."), *repealed by* Act of Aug. 27, 1935, Pub.L. No. 74–349, 49 Stat. 882, 882 § 1.

**41.** *See* H.R.Rep. No. 74–665, at 2 (1935).

**42.** *See* D.C. Public Utilities Act, *supra* note 40, para. 91, 37 Stat. at 993.

**43.** *Procedural Changes Affecting the Public Utilities Commission: Hearing Before the Subcomm. of the Comm. on the District of Columbia,* 74th Cong. 4 (1935) [hereinafter *Procedural Changes Hearing*] (statement of E. Barrett Prettyman, Corporation Counsel of the District of Columbia). *See also id.* at 51

While the corporation counsel expressly recognized that the possibility of an appeal was predicated on the party's having filed an application for reconsideration,[44] his proposed addition does not similarly implicate our jurisdiction. One explanation, perhaps, is the state of the doctrine of exhaustion of remedies in 1935. At that time, exhaustion was still a doctrine governing courts' exercise of equity jurisdiction.[45] Until a few years later, in 1938, it may not have been clear that the exhaustion doctrine extended to legal claims as well.[46] Prettyman's request three years earlier may have been no more than a push to ensure that the exhaustion doctrine would apply to every issue—a codification and extension of the doctrine, but not a jurisdictional limitation.

Moreover, there is nothing inherently implausible or self-contradictory about an exhaustion law that rests jurisdiction on exhaustion of remedies, but only imposes an ordinary exhaustion requirement for issues. Indeed, that is how the Second Circuit has interpreted 8 U.S.C. § 1252(d)(1). That statute provides that a "court may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right." (Dash and subparagraph number omitted.) In *Lin Zhong v. United States Department of Justice,* the Second Circuit explained that the statute bars a circuit court from considering any claims unless the alien has pursued all administrative avenues of relief.[47] However, the court noted that unlike other jurisdictional statutes (including 29 U.S.C. § 160(e), discussed above), 8 U.S.C. § 1252(d)(1) does not require that every *issue* have been presented to the immigration authorities.[48] Given the absence of an express issue-exhaustion requirement, the *Lin Zhong* court concluded:

> 8 U.S.C. § 1252(d)(1) does not require—as a *statutory* matter—that a pe-

(statement of E. Barrett Prettyman, Corporation Counsel of the District of Columbia) ("The plan of this act is to make perfectly definite and certain the points of dispute after the Commission has once had its hearing and entered its order. The utility then appealing would then make definite and certain the issues involved.... [T]hey would allege that on such and such matter of law the Commission has decided wrongly, and on that perfectly well-crystallized issue of law, we would go before the court....").

44. Prettyman glossed the draft bill as meaning that "so long as there is an application for reconsideration, there can then be an appeal." Presumably, he would have agreed that without an application, there could not be an appeal.

45. *See Natural Gas Pipeline Co. of Am. v. Slattery,* 302 U.S. 300, 310–11, 58 S.Ct. 199, 82 L.Ed. 276 (1937) (discussing "[t]he rule that a suitor must exhaust his administrative remedies before seeking the extraordinary relief of a court of equity" in the context of "the sound discretion which guides exercise of equity jurisdiction").

46. *See* John F. Duffy, *Administrative Common Law in Judicial Review,* 77 Tex. L.Rev. 113, 155 (1998) (discussing the Supreme Court's decision in *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51 & n. 9, 58 S.Ct. 459, 82 L.Ed. 638 (1938), and arguing that before the *Myers* decision, "[t]he Court had never before described the exhaustion doctrine as a rule of judicial administration," applicable to both law and equity); Raoul Berger, *Exhaustion of Administrative Remedies,* 48 Yale L.J. 981, 993 (1939) ("Although the exhaustion doctrine is a product of chancery, the rule has gradually been extended to suits at law, and that tendency is recognized and articulated in the *Myers* case.").

47. *See Lin Zhong v. U.S. Dep't of Justice,* 480 F.3d 104, 118–19 & n. 18 (2d Cir.2007); *see also Grullon v. Mukasey,* 509 F.3d 107, 111–12 (2d Cir.2007) (clarifying, after *Lin Zhong,* that failure to take an administrative appeal forecloses circuit court jurisdiction).

48. *See Lin Zhong,* 480 F.3d at 120–21.

titioner for relief from removal raise to the [agency] each issue presented in his or her petition for judicial review. Therefore ... the failure to exhaust individual issues before the BIA does not deprive this court of subject matter jurisdiction to consider those issues.[49]

Of course, unlike 8 U.S.C. § 1252(d)(1), D.C.Code § 34–604(b) *does* contain an express issue-exhaustion requirement. It prevents any person from "urg[ing]' or rely[ing]' on any ground" not raised to the Commission. But unlike 29 U.S.C. § 160(e), to which the *Lin Zhong* court compared 8 U.S.C. § 1252(d)(1), D.C.Code § 34–604(b)'s issue-exhaustion requirement is not intertwined with the jurisdictional command. It is found in a separate, though complementary, sentence.

In speaking to parties rather than courts, the text of the issue-exhaustion requirement in § 604(b) is perhaps closer to a third federal statute than it is to either 8 U.S.C. § 1252(d)(1) or 29 U.S.C. § 160(e). According to 7 U.S.C. § 6912(e), "a person shall exhaust all administrative appeal procedures established by the Secretary [of Agriculture] or required by law before the person may bring an action in a court of competent jurisdiction." That language, the Ninth Circuit held, does not "mention[ ], define[ ], or limit[ ] federal jurisdiction."[50] Instead, the court suggested that the statute was "merely a codification of the [judicially created] exhaustion requirement."[51]

Although the question is undeniably a close one, we think the same is true here. The sentence in 604(b) with which we are concerned is not a "clear [and] unequivocal" statement of the legislature's intent to divest us of appellate jurisdiction.[52] Nor does the legislative history reveal an unequivocal intent to limit the appellate court's power; it merely shows that Congress intended to require litigants before the Commission to exhaust their administrative remedies—that is why it speaks to the parties, not to the court. Furthermore, unlike the Prison Litigation Reform Act,[53] the history and text of the issue-exhaustion provision manifest no congressional intent to eliminate judicially-recognized exceptions to the exhaustion requirement. We therefore find persuasive the federal circuit court decisions interpreting the roughly similar 7 U.S.C. § 6912(e), and

**49.** *Id.* at 121–22. *See also Lin Zhong v. U.S. Dep't of Justice (Lin Zhong II )*, 489 F.3d 126, 130–33 (Calabresi, J., concurring in the denial of rehearing en banc).

**50.** *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 980 (9th Cir.2002).

**51.** *Id. See also Munsell v. Dep't of Agriculture*, 379 U.S.App. D.C. 45, 53–54, 509 F.3d 572, 580–81 (2007) (agreeing with *McBride Cotton & Cattle* ); *Dawson Farms, LLC v. Farm Service Agency*, 504 F.3d 592, 597, 602–05 (5th Cir.2007) (same); *Ace Prop. and Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 999–1000 (8th Cir.2006) (same). *But see Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 94–5 (2d Cir.1998) (concluding that 7 U.S.C. § 6912(e) is mandatory and unwaivable, though not phrasing its holding in terms of jurisdiction).

**52.** *See Avocados Plus Inc. v. Veneman*, 361 U.S.App. D.C. 519, 524, 370 F.3d 1243, 1248 (2004).

**53.** *See Booth v. Churner*, 532 U.S. 731, 738–40, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). We appreciate *Booth's* suggestion that we should be slow to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Id.* at 741 n. 6, 121 S.Ct. 1819. That caution, however, is best understood in the context of the PLRA—where Congress clearly intended to trim exceptions from the statutory scheme. Cases after *Booth*, like *McBride*, 290 F.3d at 979–81, continue to interpret statutes like 7 U.S.C. § 6912(e) as codifications of the judicially-created exhaustion doctrine, allowing the possibility that the failure to exhaust may be excused.

conclude that the best reading of the issue-exhaustion bar in D.C.Code § 34–604(b) is that it codifies the judicially-created doctrine of exhaustion of remedies.[54]

## B. The Narrow "Jurisdictional Exception" to the Exhaustion Rule

Having concluded that we have jurisdiction to consider the issues raised in our supplemental briefing order notwithstanding WGLC's failure to raise them below, we now turn to the question of whether we should exercise that jurisdiction. WGLC primarily presses an exception to the exhaustion requirement that applies where the agency action suffered from a jurisdictional defect so serious that the agency lacked the power to take the action. As we have stated, though, "the general rule is that even jurisdictional questions must be put to agencies before they are brought to the reviewing court."[55] The exception WGLC invokes is "a narrow one."[56]

The "jurisdictional exception" to the exhaustion rule is derived from the D.C. Circuit's opinion in *Railroad Yardmasters of America v. Harris.*[57] In that case, the petitioner argued for the first time during judicial review that the National Mediation Board had lacked a quorum, two of its three seats having been vacant, and so had no power to issue orders.[58] The *Railroad Yardmasters* court found that it was proper to address the contention because, if accepted, it would mean that the agency "had no power to act at all" due to its vacancies.[59] It also noted that the policy underlying the waiver rule did not apply because "[r]esolution of this issue does not require the development of a factual record, the application of agency expertise, or the exercise of administrative discretion."[60] Subsequent D.C. Circuit decisions have cabined the exception "to challenges that concern the very composition or constitution of an agency."[61] The court has found waived an argument that the EPA lacked authority to aggregate sites of hazardous waste on the National Priorities List because that authority was not explicitly granted,[62] and a challenge to a Department of Transportation regulation that allegedly abrogated the Department's

---

54. *See, e.g., Dawson Farms,* 504 F.3d at 604–05 (noting the "litigant-centric language" of 7 U.S.C. § 6912(e), and concluding that it is "a codification of the jurisprudential exhaustion requirement"); *see also Washington Ass'n for Television & Children v. FCC,* 229 U.S.App. D.C. 363, 367–68, 712 F.2d 677, 681–82 (1983) (holding that 47 U.S.C. § 405 "codif[ies] the judicially-created doctrine of exhaustion of administrative remedies, which permits courts some discretion to waive exhaustion").

55. *D.C. Hous. Auth. v. D.C. Office of Human Rights,* 881 A.2d 600, 613 (D.C.2005) (internal quotation marks and brackets omitted). *See also Hisler v. D.C. Dep't of Employment Servs.,* 950 A.2d 738, 744 (D.C.2008) (quoting *D.C. Hous. Auth.*).

56. *See D.C. Hous. Auth.,* 881 A.2d at 612 (internal quotation marks omitted).

57. 232 U.S.App. D.C. 171, 721 F.2d 1332 (1983).

58. *Id.,* 232 U.S.App. D.C. at 174–75, 721 F.2d at 1335–36.

59. *Id.,* 232 U.S.App. D.C. at 177, 721 F.2d at 1338.

60. *Id.,* 232 U.S.App. D.C. at 177–78, 721 F.2d at 1338–39; *see also District of Columbia Housing Auth. v. D.C. Office of Human Rights,* 881 A.2d 600, 611–12 (D.C.2005) (quoting *Railroad Yardmasters* ).

61. *Mitchell v. Christopher,* 302 U.S.App. D.C. 109, 112, 996 F.2d 375, 378 (1993).

62. *Linemaster Switch Corp. v. EPA,* 291 U.S.App.D.C. 40, 49–50, 938 F.2d 1299, 1308–09 (1991).

authority to review and reverse certain administrative law judge orders.[63]

We have been similarly stingy in applying the jurisdictional exception. In *Jones & Artis Construction Co. v. D.C. Contract Appeals Board,* a contractor challenged the authority of the Contract Appeals Board by arguing that it had too many vacancies to form a quorum.[64] We held that its argument was waived for failure to present it to the agency, distinguishing *Railroad Yardmasters.*[65] We explained that "[u]nlike the appellee in *Railroad Yardmasters of America,* Jones & Artis does not challenge the power of the Board to act through the Chairman but only the authority of the Chairman to act alone in this particular case, absent a stipulation of the parties."[66] Likewise, we have held that failing to consult with an Equal Employment Opportunity Counselor is not a jurisdictional defect, even if it would have required the Office of Human Rights to dismiss a complainant's case had it been raised before the agency, because the challenge did not go to OHR's core power.[67]

Nonetheless, we have applied the jurisdictional exception at least once. During the month of June 1988, the F.W. Woolworth Company did not have a license for four mechanical amusement machines located in its store.[68] The Department of Consumer and Regulatory Affairs charged the company with operating unlicensed *vending* machines and, after a hearing,

fined it $400. Woolworth appealed to the Board of Appeals and Review, which agreed that the ALJ had cited an inapposite statute but sustained the violation under 19 DCMR § 1400 (1983) and reduced the fine to $250. On appeal to this Court, Woolworth argued for the first time that

> the Department and the Board have no authority whatsoever to use [19 DCMR] § 1400.7 to impose a civil sanction. More specifically, Woolworth argues that § 1400.7 provides only for criminal penalties; that the proceeding was civil, not criminal; and that the Board has no authority to use a criminal penalty provision as the basis for a civil fine.[69]

We held that "[b]ecause this is a jurisdictional argument, Woolworth cannot be deemed to have waived it by failing to raise it before the ALJ and the Board." [70] Since it certainly was well established that litigants before the Board of Appeals and Review were required to exhaust their administrative remedies, including as to jurisdictional questions,[71] *F.W. Woolworth* can best be understood as an application of the jurisdictional exception to the exhaustion requirement.

The situation in this case is similar. The Commission imposed a substantial fine on WGLC under D.C.Code § 34–706(a), and in reviewing the fine, we inquired whether the statute was criminal or civil and whether it is directly enforceable by the Commission. Although, as noted

---

63. *USAir, Inc. v. Dep't of Transp.,* 297 U.S.App. D.C. 256, 259–260, 969 F.2d 1256, 1259–1260 (1992).

64. 549 A.2d 315 (D.C.1988).

65. *See id.* at 323–24.

66. *Id.* at 324.

67. *See District of Columbia Housing Auth. v. D.C. Office of Human Rights,* 881 A.2d 600, 611–12 (D.C.2005).

68. *F.W. Woolworth Co. v. D.C. Bd. of Appeals & Rev.,* 579 A.2d 713, 715 (D.C.1990).

69. *Id.* at 716.

70. *Id.* at 716–17.

71. *See, e.g., Auger v. D.C. Bd. of Appeals & Rev.,* 477 A.2d 196, 207 (D.C.1984).

above, we need not reach the first of those issues, WGLC argues that the Commission lacks the power to adjudicate violations under § 706(a) because the statute only creates a cause of action in Superior Court. If that is so, the Commission arrogated a power not conferred by statute, just as the Board of Appeals and Review arguably lacked authority to impose a civil sanction in *F.W. Woolworth.* Since the question determines what body—the Commission or the Superior Court—had the legal authority to adjudicate the violation of which WGLC was accused, it "concern[s] the very ... constitution of [the] agency." [72] If we were to determine that § 706(a) only creates a cause of action enforceable in Superior Court, it would similarly imply that the Commission's order was "patently in excess of [its] authority," [73] and that the Commission was "inherently without authority" to impose the forfeiture. [74] We turn to the substance of that question now.

### III. The Authority of the Public Service Commission Under D.C.Code § 34–706(a)

When it imposed the $350,000 forfeiture, the Commission stated that WGLC's failure to produce its entire contract with Accenture was an "egregious violation[ ] of [D.C.Code] Sections 34–904, [-]905 and [-]907," as well as a "clear violation" of two previous orders. The only authorities the Commission cited for its power to impose the forfeiture as a sanction for those violations were D.C.Code §§ 34–706(a) and – 708. Section 708 clearly does not provide the Commission with such authority; it merely permits each day of a knowing and willful violation to be counted a separate

violation.[75] The Commission's assertion of adjudicatory authority for the forfeiture thus rests solely on § 706(a).

Section 706(a) creates a sanction for public utilities that fail to obey a statute, a regulation, or an order by the Commission. In full, it reads:

> If any public utility shall violate any provision of this subtitle, or shall do any act herein prohibited, or shall fail or refuse to perform any duty enjoined upon it for which a penalty has not been provided, or shall fail, neglect, or refuse to obey any lawful requirement or order made by the Commission, or any judgment or decree made by any court upon its application, for every such violation, failure, or refusal such public utility shall forfeit and pay to the District of Columbia the sum of $5,000 for each such offense. In construing and enforcing the provisions of this section, the act, omission, or failure of any officer, agent, or other person acting for or employed by any public utility acting within the scope of his employment and instructions shall in every case be deemed to be the act, omission, or failure of such public utility.

But what body has jurisdiction to adjudicate the fact of the violation and impose the sanction, the Commission or the Superior Court?

The Commission claims such jurisdiction, and it urges us to defer to its interpretation of § 706(a). As a general rule, where an agency is assigned the responsibility to administer an ambiguous statute, we do defer to the agency's interpretation—but only if that interpretation is reasonable in light of the statutory lan-

---

**72.** *Mitchell v. Christopher,* 302 U.S.App. D.C. 109, 112–13, 996 F.2d 375, 378–79 (1993).

**73.** *Washington Ass'n for Television & Children v. FCC,* 229 U.S.App. D.C. 363, 368, 712 F.2d 677, 682 (1983).

**74.** *Jones & Artis Const. Co. v. D.C. Contract Appeals Bd.,* 549 A.2d 315, 324 (D.C.1988).

**75.** *See* D.C.Code § 34–708.

guage, the legislative history, and judicial precedent.[76] We apply that rule even where an agency is interpreting the breadth of its own power.[77] We acknowledge that the Commission, at least for the past twenty-five years, has interpreted § 706(a) as giving it adjudicatory authority.[78] (On the other hand, this is, to our knowledge, the first time the Commission has been obliged to justify that position,[79] and "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances," including the care with which the agency examined the issue and the degree of its expertise on the question relative to that of the courts.[80]) In this case, though, as we shall explain, we ultimately see no ambiguity in § 706(a), because we conclude that the only reasonable interpretation of the statute is that it creates a cause of action in the Superior Court. We therefore need not defer to the Commission's position.[81]

## A. The Text of § 706(a)

 Parsing § 706(a) is a question of statutory interpretation, so we begin, as ever, with the plain language and ordinary meaning of the statute at issue.[82] The

76. See, e.g., Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs., 825 A.2d 292, 294 (D.C.2003).

77. See, e.g., CFTC v. Schor, 478 U.S. 833, 844–47, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (holding that deference is required where agency created regulation permitting it to adjudicate counterclaims and Congress both contemplated and later ratified such adjudications).

78. See Capitol Cab Coop. Ass'n, 6 D.C. P.S.C. 542 (1985). See also District of Columbia Natural Gas, 102 P.U.R.4th 582, 9 D.C. P.S.C. 452 (1988) ($900 fine); In re The Investigation into Washington Gas Light's Compliance with Its Tariffs, No. 1041, 2007 D.C. PUC LEXIS 232, 2007 WL 4233169 (Sept. 12, 2007) ($25,-000 fine).

79. In several instances, the Commission's regulations arguably refer to its purported ability to impose fines, but they have not scrutinized it. See, e.g., Notice of Proposed Rulemaking, 55 D.C.Reg. 9109 (Aug. 22, 2008) (stating that "[f]ailure to comply with [the proposed regulations] may result in the penalties described in D.C. Official Code § 34–706 for failure to comply with Commission rules and regulations," but without elucidating whether or why the Commission has the authority to impose fines pursuant to the statute). Still, that assertion cleared public notice, so it is arguably entitled to some deference.

80. United States v. Mead Corp., 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). See also Bowen v. Georgetown Univ. Hosp.,

488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (rejecting suggestion that the Court should defer to position taken for the first time in a brief). We also acknowledge that the chair of the Commission, testifying before the D.C. Council, stated that § 706(a) "is the Commission's statutory authority for imposing civil penalties." Statement of Agnes A. Yates, Chairperson, Pub. Serv. Comm'n of the District of Columbia, at 7, Public Roundtable on B15–872, The Omnibus Utility Amendment Act of 2004 (July 1, 2004). But legislative testimony is not the type of considered decision that commands our deference. See Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that agency's interpretation arrived at in opinion letter, rather than one after notice-and-comment rulemaking or formal adjudication, was entitled to respect but not to deference).

81. See, e.g., Barnhart v. Sigmon Coal Co., 534 U.S. 438, 462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("In the context of an unambiguous statute, we need not contemplate deferring to the agency's interpretation."); Pannell–Pringle v. D.C. Dep't of Employment Servs., 806 A.2d 209, 210 ("First, the reviewing court must determine whether the meaning of the statute is clear. If it is, that is the end of the matter." (internal quotation marks and citation omitted)).

82. See, e.g., 1836 S Street Tenants Ass'n, Inc. v. Estate of B. Battle, 965 A.2d 832, 838 (D.C. 2009); Veney v. United States, 936 A.2d 811, 822 (D.C.2007).

statute does not expressly designate either the Commission or the Superior Court as the adjudicator of an alleged violation. We find two strong textual clues, though, indicating that Congress intended to create a cause of action to be brought in Superior Court. The first is that § 706(a), in addition to penalizing a public utility's failure to comply with violations of statutes, regulations, and Commission orders, also penalizes the utility's failure to obey "any judgment or decree made by any court upon [the Commission's] application." Therefore, if the Commission is allowed to adjudicate violations of § 706(a), it is allowed to adjudicate violations of court orders. We think that is a dubious proposition; the contempt process is the usual route by which a jurisdiction "vindicates the regular operation of its judicial system."[83] A more reasonable reading of the statute is that the Superior Court alone has authority to punish a public utility when it disregards either the Commission's orders or those of a court.

The second and more decisive clue is Congress's use of the phrase "forfeit and pay." In 1913, when the D.C. Public Utilities Act was passed, that phrase was understood to create an action of debt. It was a well established proposition at common law that "where a penalty is given by a statute, and no remedy for its recovery is expressly given, debt lies."[84] As early as 1805, the Supreme Court had occasion to interpret a statute with a forfeiture provision analogous to the one in § 706(a). The Slave Trade Act of 1794 contained a qui tam provision stating that "every person . . . [involved in the use of a ship in the slave trade] shall severally forfeit and pay the sum of two thousand dollars," but did not further specify how the forfeiture provision was to be enforced.[85] The Court, in deciding the statute of limitations on a relator's action to obtain the forfeiture, characterized the suit as "an action of debt," and, it noted, "[a]lmost every fine or forfeiture, under a penal statute may be recovered by an action of debt as well as

**83.** *See Juidice v. Vail*, 430 U.S. 327, 335, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (discussing abstention).

**84.** *Jacob v. United States*, 13 F. Cas. 267, 268 (Marshall, Circuit Justice, C.C. Va. 1821) (No. 7157). *See also, e.g., Stockwell v. United States*, 80 U.S. (13 Wall.) 531, 542, 20 L.Ed. 491 (1871) (discussing forfeiture statute and stating, "[d]ebt lies whenever a sum certain is due to the plaintiff, or a sum which can readily be reduced to a certainty. . . . It is not necessarily founded upon contract"); *Bullard v. Bell*, 4 F. Cas. 624, 642 (Story, Circuit Justice, C.C.N.H. 1817) (No. 2121) (reasoning that "[n]othing can be better settled, than that an action of debt lies for a duty, created by the common law, or by custom. A fortiori it must lie, where the duty is created by statute" (citation omitted)); Frederick W. Maitland, *The Forms of Action at Common Law*, lecture V, para. 28 (1909), *available at* http://www.fordham.edu/halsall/basis/maitland-forms ofaction.html ("[T]he action of debt is not necessarily based on contract—it serves for the recovery of statutory penalties, of forfeitures under by-laws, of amercements, and of monies adjudged by a court to be due."); 1 Joseph Chitty, *Treatise on Pleading* *125, *available at* http://books.google.com/books?id=EV40AAAAIAAJ ("[I]f a statute prohibit the doing [of] an act under a penalty or forfeiture to be paid to a party grieved, and do not prescribe any mode of recovery, it may be recovered in this form of action [i.e. debt]. . . ."). *See generally* William Blackstone, 4 *Commentaries on the Laws of England* *159–61, *available at* http://books.google.com/books?id=RwU9AAAAIAAJ (discussing forfeitures as a type of contract implied by law, which "immediately create a debt in the eyes of the law" and "for which the remedy is by action of debt").

**85.** *See* An Act to Prohibit the Carrying on the Slave Trade from the United States to Any Foreign Place or Country, § 2, ch. XI, 1 Stat. 347, 349 (1794). *Cf. id.* § 4, 1 Stat. at 349 (providing that the forfeiture under that section could be "recovered in any court of the United States proper to try the same").

by [criminal] information." [86] Similarly, in a 1909 case, *Hepner v. United States*, the Supreme Court described as an action of debt a proceeding under a statute which provided that anyone who brought an alien to the United States to perform labor "shall forfeit and pay for every such offense the sum of one thousand dollars, which may be sued for and recovered by the United States." [87] The fact that D.C.Code § 34–706(a) specifies a liquidated sum of damages—originally $200 [88] —further supports our interpretation.[89] To recover the debt, a plaintiff must prove that it exists.[90] And a court was where that proof was made.[91] Nothing about the D.C. Public Utilities Act or Title 34 suggests that Congress intended to deviate from that practice when it promulgated § 706(a).[92] Standing alone, then, the "shall forfeit and pay" clause of § 706(a) certainly suggests that the adjudicatory authority for a violation lies in the Superior Court.

Indeed, we note that in 1913, the Commission's General Counsel seems to have comprehended § 706(a) the same way. In a letter opinion published by the Commission in its first Annual Report, he wrote:

I am of the opinion that a proceeding may be brought in the police court in the District of Columbia to enforce the fines or forfeitures provided by paragraph 85 [now § 706(a)] of the Public Utilities Commission law. In this connection I have to state that there is some doubt, under the peculiar wording of the law, whether this penalty is intended to be enforced by civil or quasi-criminal proceedings. The only way to have the procedure definitely determined is to institute a proceeding in the police court and have the matter finally settled by the court of appeals.[93]

While not conclusive, the General Counsel's opinion certainly suggests that in 1913, when § 706(a) was enacted, it was understood to create a cause of action in a

**86.** *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341, 2 L.Ed. 297 (1805) (Marshall, C.J.).

**87.** 213 U.S. 103, 104, 29 S.Ct. 474, 53 L.Ed. 720 (1909).

**88.** D.C. Public Utilities Act, *supra* note 40, para. 85, 37 Stat. at 992 (codified as amended at D.C.Code § 34–706(a)).

**89.** *See, e.g., Chaffee & Co. v. United States*, 18 Wall. 516, 85 U.S. 516, 538, 21 L.Ed. 908 (1873) ("The action of debt lies for a statutory penalty, because the sum demanded is certain...."); *Stockwell*, 80 U.S. (13 Wall.) at 542 ("Debt lies whenever a sum certain is due to the plaintiff, or a sum which can readily be reduced to a certainty—a sum requiring no future valuation to settle its amount.").

**90.** *See, e.g., Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909) (holding that it was appropriate, in case with no dispute of material facts as to whether the defendant committed the act giving rise to the forfeiture, to grant summary judgment awarding forfeiture to government).

**91.** *See Feltner v. Columbia Pictures Television*, 523 U.S. 340, 350, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998) (describing an action of debt as "a prototypical action brought in a court of law before a jury").

**92.** *Cf. 1618 Twenty–First Street Tenants' Ass'n, Inc. v. The Phillips Collection*, 829 A.2d 201, 203 (D.C.2003) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meanings of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (internal quotation marks omitted)).

**93.** Letter Opinion of December 5, 1913, *in* 1913 Annual Report of the Public Utilities Commission of the District of Columbia, H.R. Doc. No. 63–1110, at 99 (1914), *microformed on* CIS No. 6733 H.Doc. 1110 (Cong. Info.Serv.).

trial court. The General Counsel's only question appears to have been whether the action was civil or quasi-criminal—a difference that might, among other effects, change the level of proof the Commission was required to meet.[94]

Our reading is further supported by a comparison to other administrative agency statutes in force at the time of the D.C. Public Utilities Act. Consider the Interstate Commerce Act, which was similar to the D.C. Public Utilities Act in time, purpose, and language. In 1912 and 1913, while the latter was under consideration, the recently-enacted statute conferring the Interstate Commerce Commission's general enforcement powers read:

Any carrier [or its agent] ... who knowingly fails or neglects to obey any order made under the provisions of section fifteen of this Act shall forfeit to the United States the sum of five thousand dollars for each offense. Every distinct violation shall be a separate offense, and in case of a continuing violation each day shall be deemed a separate offense.

The forfeiture provided for in this Act shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States, brought in the district where the carrier has its principal operating office, or in any district through which the road of the carrier runs.

It shall be the duty of the various district attorneys, under the direction of the Attorney–General of the United States, to prosecute for the recovery of forfeitures.[95]

Most of these provisions have a close analog in the D.C. Public Utilities Act.[96] Forfeitures under the Interstate Commerce Act required the initiation of a lawsuit and a court's adjudication of the fact of violation.[97] Modern analogies exist, too. In the current United States Code, there are numerous forfeiture penalties that must be sued out in federal court.[98]

---

94. *See, e.g., Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (discussing "intermediate standard" of proof, between proof by a preponderance of the evidence and proof beyond a reasonable doubt, and noting that "[o]ne typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant").

95. Act of June 18, 1910, § 13, Pub.L. No. 61–218, 36 Stat. 539, 554–55, *further amending* Interstate Commerce Act, § 16, ch. 104, 24 Stat. 379, 384–85 (1887).

96. D.C.Code §§ 34–706(a) and –708, read together, provide that a knowing violation of a Commission order is a separate violation each day it continues. Section 706(a) provides that the forfeiture must be paid "to the District of Columbia." *See also* D.C.Code § 34–710 (2001). And paragraph 91 of the D.C. Public Utilities Act, *supra* note 40, 37 Stat. at 993 (codified as amended at D.C.Code § 34–803 (2001)), gave the corporation counsel the duty to "prosecute any ... case to recover any penalty, forfeiture, or fine."

97. *See United States v. Penn. R.R. Co.,* 308 F.Supp. 293, 295–97 (E.D.Pa.1969) (adjudicating on summary judgment pertinent facts, including whether violation was "knowing"); *see also S. Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 349–50, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982) ("[T]he ICC has ample authority to police the credit practices of carriers.... This authority includes ... the power to bring suit for the $5,000 civil forfeiture, provided by [§ 16 of the Interstate Commerce Act]...."); *United States v. W. Pac. R.R. Co.,* 385 F.2d 161, 162–63 (10th Cir. 1967) (reversing grant of motion to dismiss and remanding for trial).

98. To cite a few examples: 7 U.S.C. § 215 imposes a $500 forfeiture for failure to obey an order of the Secretary of Agriculture, "recoverable in a civil suit in the name of the United States." Both the courts and the Secretary of Agriculture have taken the statute to require adjudication of the fact of violation by a district court. *See United States v. Hulings,* 484 F.Supp. 562 (D.Kan.1980); *In re Gerald F. Upton,* 44 Agric. Dec. 2861, 2862 (1985)

Admittedly, the Interstate Commerce Act and the modern statutes we find persuasive explicitly state how the forfeiture is to be recovered,[99] while § 706(a) does not. Still, we think Congress's silence on that point cannot outweigh the presumption that forfeitures without specified modes of recovery are actions in debt,[100] especially in view of other statutes, contemporaries to the D.C. Public Utilities Act, in which Congress did provide agencies with the power to fine. As the Commission states in its supplemental brief, § 706(a) "was enacted against the backdrop of well-settled law that Congress could empower agencies to impose civil penalties at the administrative level." We do not doubt Congress's *ability* to vest such adjudicatory authority in the Commission, particularly in view of its plenary authority over the District.[101] Merely because Congress could, though, does not mean that it did. And in 1913, when Congress meant to create such authority, it did so expressly.

Thus, we note that two cases on which the Commission relies, *Oceanic Steam Navigation Co. v. Stranahan*[102] and *Passavant v. United States*,[103] each concerns a statute that explicitly conferred on an agency the adjudicatory power to fine. In *Stranahan*, the Supreme Court upheld an immigration statute that made it unlawful to bring to the United States "any alien afflicted with a loathsome or with a dangerous contagious disease." The statute continued:

> [I]f it shall appear *to the satisfaction of the Secretary of the Treasury* ... that any alien so brought to the United States was afflicted with such a disease at the time of foreign embarkation, and that the existence of such disease might have been detected by means of a competent medical examination at such time, such person ... shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of one hundred dollars for each and

(contrasting fine which may be assessed by the Secretary under 7 U.S.C. § 213(a) with fine which may be assessed by court under 7 U.S.C. § 215).

15 U.S.C. § 21 (*l*) creates a forfeiture of up to $5,000 for the violation of a Federal Trade Commission order, which "may be recovered in an action brought by the United States." The fact of violation is adjudicated by the court. *See, e.g., United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (generally discussing what constitutes a "continuing" violation of the statute, enabling a penalty per diem).

One exception is 19 U.S.C. § 1337(f)(2), which similarly creates a forfeiture for a violation of an International Trade Commission order. While the penalty "may be recovered for the United States in a civil action brought by the Commission in [district court]," the Federal Circuit has interpreted the "recovery" action to be one in the nature of a collection proceeding rather than an adjudication, meaning that the International Trade Commission may fix the amount of forfeiture by order and merely sue to collect if the

violator does not pay voluntarily. *See San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n*, 161 F.3d 1347, 1350–54 (Fed. Cir.1998) (discussing question and rejecting analogy to FTC statute).

**99.** So does another provision in the D.C. Public Utilities Act. *See* D.C.Code § 34–905(a) (2001) (providing that if a public utility refuses to furnish to the Commission a document kept outside of the District of Columbia, "for each day it shall ... forfeit and pay to the District of Columbia the sum of $100, *to be recovered in an action to be brought in the name of said District*" (emphasis added)).

**100.** *See supra* notes 84, 89.

**101.** *See* U.S. Const. Art. I, § 8, cl. 17.

**102.** 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909).

**103.** 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426 (1893).

every violation of the provisions of this section.[104]

In *Passavant,* the Court likewise approved a statute under which a tariff collector, an employee of the Secretary of the Treasury, could impose a fine on an importer who falsely underestimated the value of goods. The law provided:

> [T]he collector . . . shall cause the actual market value or wholesale price of such merchandise to be appraised, and if the appraised value of any article of imported merchandise shall exceed by more than ten per centum the value declared in the entry, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, a further sum equal to two per centum of the total appraised value. . . . [105]

In this case, D.C.Code § 34–706(a) does not predicate the forfeiture on the satisfaction of the Commission. Nor does it confer the power to fine as adjunctive to the power to collect money for another purpose. From these statutes, one might easily infer that Congress did *not* intend to give the Commission the power to impose fines itself—if it had meant to do so, it knew how. Here too, there are modern analogies; current statutes often expressly give an agency the authority to "assess" a

penalty[106] or specify that a violator becomes liable after the agency conducts a hearing and makes appropriate findings.[107] The Commission has suggested no case in which a court construed a statute similarly worded to § 706(a) to confer adjudicatory authority on an agency, and we are aware of none.

## B. The Statutory Context of § 706(a)

■ Though we find compelling the ordinary meaning of § 706(a)'s forfeiture clause, we cannot end our analysis with it. "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter."[108] We must read the entire D.C. Public Utilities Act together, so as to give effect "to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[109]

First, we look to two provisions which generally describe the Commission's duties and powers, and on which the Commission heavily relies in its brief. D.C.Code § 34–402 states that "[t]he Commission . . . shall have the power, and it shall be its duty, to enforce the provisions of this subtitle as well as all other laws relating to public

**104.** *Stranahan,* 214 U.S. at 321–22, 29 S.Ct. 671 (quoting An Act to Regulate the Immigration of Aliens into the United States, § 9, Pub.L. No. 57–162, 32 Stat. 1213, 1215–16 (1903)) (emphasis added) (insertion and internal quotation marks omitted).

**105.** Act of June 10, 1890, § 7, ch. 407, 26 Stat. 131, 134–35, *discussed in Passavant,* 148 U.S. at 215–21, 13 S.Ct. 572.

**106.** *See, e.g.,* 7 U.S.C. § 193(b) (Secretary of Agriculture); 12 U.S.C. § 93(b)(5) (Comptroller of the Currency); 29 U.S.C. § 666(j) (Occupational Safety and Health Commission).

**107.** *See, e.g.,* 49 U.S.C. § 521(B)(2).

**108.** *Cook v. Edgewood Mgmt. Corp.,* 825 A.2d 939, 946 (D.C.2003) (quoting *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)).

**109.** *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004). *See also United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850), *quoted in U.S. Nat'l Bank of Oregon,* 508 U.S. at 456, 113 S.Ct. 2173 ("In expounding a statute, [the Court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.").

utilities." [110] Another paragraph in the D.C. Public Utilities Act, since superseded, similarly stated that "all the powers created by this section and the duty of carrying this section into effect and enforcing the provisions thereof are hereby vested in and imposed on the Commission[ ]." [111] Emphasizing the word "enforce," the Commission argues that the language demonstrates that it can adjudicate violations and impose fines under § 34–706(a). While that is one interpretation of "enforce," another is that the Commission has the power and responsibility to pursue violations by maintaining a suit in Superior Court. Consider the paragraph that originally followed § 34–402 in the D.C. Public Utilities Act:

> It shall be the duty of the [D.C. corporation counsel, acting as the Commission's] general counsel to represent and appear for the [C]ommission in all actions and proceedings involving any question under [the D.C. Public Utilities Act], or under or in reference to any act, order, or proceeding of the commission ... [and] to commence and prosecute all actions and proceedings directed or authorized by the [C]ommission.... The said [general] counsel ... shall have the right to appear and prosecute any civil, quasi criminal, or criminal case to recover any penalty, *forfeiture,* [or] fine, or for the imposition of any punishment provided for in [the D.C. Public Utilities Act].... *The [C]ommission may enforce its orders in any case by mandamus or other legal or equitable remedy in any court of competent jurisdiction,* and it shall be the duty of the corporation counsel to represent the [C]ommission in every such proceeding. [112]

This provision gave the Commission the power to "enforce" its orders through a court action; it does not suggest that the Commission may impose a forfeiture itself. And while the Commission argues that the statute is worded in the permissive and therefore should not be read to rule out Commission-ordered sanctions, it is telling that paragraph 91 was the only paragraph in the D.C. Public Utilities Act to specify *how* the Commission was to enforce its orders.

The second statute cited by the Commission, D.C.Code § 34–403, instructs us to "interpret[ ] and construe[ ] [the public utilities statutes] liberally in order to accomplish the purposes thereof, and where any specific power or authority is given the Commission by the provisions of this subti-

110. *See also* D.C.Code § 34–1103 (2001) ("The Commission shall have power, after hearing and notice by order in writing, to require and compel every public utility to comply with the provisions of this subtitle ...."); *cf.* D.C.Code § 34–803 ("The Commission may enforce its orders [in] any case by legal or equitable remedy in any court of competent jurisdiction, and it shall be the duty of the General Counsel to represent the Commission in every such proceeding.").

111. D.C. Public Utilities Act, *supra* note 40, para. 97, 37 Stat. at 995.

112. *Id.* para. 91, 37 Stat. at 993 (emphasis added) (codified as amended at D.C.Code § 34–803). The current version of the statute, § 803, likewise provides that "[t]he Commis-sion may enforce its orders [in] any case by legal or equitable remedy in any court of competent jurisdiction, and it shall be the duty of the General Counsel to represent the Commission in every such proceeding." While paragraph 91 was superseded in part by the Public Service Commission General Counsel Act of 1980, D.C. Law 3–124, 28 D.C.Reg. 90 (1981), the changes are not germane. That legislation was only intended to provide the Commission with counsel adequate to its needs, not to affect the substantive powers of the Commission. *See, e.g.,* Council of the District of Columbia, Committee on Public Services and Consumer Affairs, Report on Bill 3–269, "Public Service Commission General Counsel Act of 1980" (Sept. 23, 1980).

tle the enumeration thereof shall not be held to exclude or impair any other power or authority otherwise in this subtitle conferred." The statute continues, "[t]he Commission hereby created shall have, in addition to the powers in this subtitle specified, ... all additional, implied, and incidental power which may be proper and necessary to ... execute all the said powers herein specified." In the Commission's view, the statute demonstrates that Congress intended to give it the maximum power permissible under the Constitution. The power to fine, the Commission tacitly suggests, is an "implied" or "incidental" power, "proper and necessary" to the execution of the Commission's duties.

While grants of incidental power are often broadly construed,[113] there are two reasons why § 403 does not contravene our plain-language reading of § 706(a). First, there is a countervailing legal principle. As the Supreme Court said about the Federal Trade Commission, the Public Service Commission too "is an administrative body possessing only such powers as are granted by statute. It may make only such orders as the act authorizes...."[114] We are accordingly hesitant to agree with the Commission's suggestion,

in the absence of any express benison of either Congress or the Council, that it possesses the authority to adjudicate a cause of action that traditionally was litigated in court. Second, although we have never addressed the question directly, our case law appears to have construed § 403 in a narrower way: to fill lacunae left by Congress, rather than to confer on the Commission any power whatsoever it might deem necessary to enforce the public utilities laws. This narrower interpretation is consonant with the statute's text, which permits the exercise of incidental powers "to ... execute all the said powers herein specified."[115] That is, § 403 confers ancillary powers to execute *powers*, not ancillary powers to execute *goals*.[116] The incidental power the Commission seeks must therefore be instrumental to the exercise of a legitimate power the statute explicitly gives it. Thus, we have held that since the Commission has authority to set rates, § 403 gives it the instrumental power to establish interim rates[117] or to permit a fuel adjustment clause in rate schedules.[118] Conversely, § 403 does not give the Commission the power to require taxicabs to post proof of insurance or bonds as liability coverage, because the

---

113. One arguably analogous federal statute is 12 U.S.C. § 24 (Seventh), which gives national banks "power ... [t]o exercise ... subject to law, all such incidental powers as shall be necessary to carry on the business of banking." The federal circuit courts have given the broad statute a broad interpretation: "Incidental powers include activities that are convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. The incidental powers of national banks are thus not limited to activities deemed essential to the exercise of enumerated powers but include activities closely related to banking and useful in carrying out the business of banking." *See, e.g.,* *Bank of America v. City & County of San Francisco,* 309 F.3d 551, 562 (9th Cir.2002).

114. *Arrow–Hart & Hegeman Elec. Co. v. Federal Trade Comm'n,* 291 U.S. 587, 598, 54 S.Ct. 532, 78 L.Ed. 1007 (1934).

115. D.C.Code § 34–403.

116. *Cf.* 12 U.S.C. § 24 (Seventh) (giving powers necessary to "carry on the business of banking").

117. *Chesapeake & Potomac Tel. Co. v. Pub. Serv. Comm'n,* 330 A.2d 236, 240 (D.C.1974).

118. *People's Counsel of the District of Columbia v. Pub. Serv. Comm'n,* 472 A.2d 860, 864–66 (D.C.1984).

remainder of the Public Utilities Act "contains no mention or implication of any authority delegated to the [C]ommission to make or enforce such a regulation."[119] Under that reading of § 403, if Congress did not give the Commission the power to fine, the Commission cannot bootstrap that power through an assertion that the power is "incidental" to its other powers.[120]

We also must consider § 706(a)'s relation to the Public Utilities Act's other penal and enforcement provisions. In the Act, § 706(a)—paragraph 85—was only part of a broader punitive scheme. The paragraph was included amidst a series of statutory provisions that *criminalized* a variety of specific misbehavior: making false statements in connection with issuing instruments of debt from public utility companies,[121] demanding rates other than those prescribed by the Commission,[122] soliciting or accepting "rebate[s]" in exchange for cheaper service,[123] failing or refusing to provide information to the Commission,[124] and interfering with an apparatus owned or operated by the Commission.[125] Another paragraph made it unlawful for a utility to charge a consumer less than the approved rate in exchange for providing transmission facilities, but did not expressly set a penalty or an enforcement mechanism,[126] leading us to infer that Congress intended its violation to be primarily punishable through § 706(a). Several of these provisions, like § 706(a) itself, characterized their violation as "an offense."[127] We

---

**119.** *See Patrick v. Smith*, 60 App. D.C. 6, 7, 45 F.2d 924, 925 (1930).

**120.** *See also Gold Kist, Inc. v. U.S. Dep't of Agric.*, 741 F.2d 344 (11th Cir.1984) (rejecting agency position that plenary authority to regulate necessarily carried with it the power to impose a monetary penalty).

We also find unconvincing the Commission's reliance on the decision of the Court of Appeals of Maryland in *Lussier v. Maryland Racing Commission*, 343 Md. 681, 684 A.2d 804 (1996). Maryland law states that with certain exclusions, the Racing Commission was empowered to "adopt regulations and conditions to govern racing and betting on racing in the State." Md.Code Ann., Bus. Reg. § 1–210, *quoted in Lussier*, 684 A.2d at 807. Under that authority, the Maryland Racing Commission promulgated a regulation that stated that upon a finding of certain unethical and prohibited conduct, "the Commission may impose a fine not exceeding $5,000." Md.Code Regs. 09.10.04.03D (2), *quoted in Lussier*, 684 A.2d at 804 n. 1. The Court of Appeals held that the broad authority conferred on the Racing Commission to create regulations "to govern racing and betting on racing" implicitly included the authority to promulgate those that called for monetary sanctions. *Lussier*, 684 A.2d at 807–813. But even assuming that the D.C. Public Service Commission has similarly sweeping power to create penal regulations—an issue we need not decide—it has not done so.

**121.** D.C. Public Utilities Act, *supra* note 40, para. 80, 37 Stat. at 991 (codified at D.C.Code § 34–701 (2001)).

**122.** *Id.* para. 81, 37 Stat. at 991 (codified as amended at D.C.Code § 34–702 (2009 Supp.)).

**123.** *Id.* para. 83, 37 Stat. at 991–92 (codified as amended at D.C.Code § 34–704 (2001)).

**124.** *Id.* para. 84, 37 Stat. at 992 (codified at D.C.Code § 34–705 (2001)). Notably, this law, which is directed toward "[a]ny officer, agent, or employee of any public utility," explicitly makes a misdemeanor of "fail[ing] or refus[ing] to exhibit to the Commission or any commissioner . . . any book, paper, account, record, or memoranda of [the] public utility," punishable by a fine of between $200 and $1000, with an accompanying fine on the utility itself if the utility directed the disobedience. *See* D.C.Code § 34–705.

**125.** *See* D.C. Public Utilities Act, *supra* note 40, para. 86, 37 Stat. at 992 (codified at D.C.Code § 34–707 (2001)).

**126.** *Id.* para. 82, 37 Stat. at 991 (codified at D.C.Code § 34–703 (2001)).

**127.** *See* D.C.Code § 34–702; *id.* § 34–704; *id.* § 34–705; *id.* § 706(a).

think it is implausible that Congress would enact all of these statutes as a bloc, using similar language and a similar structure throughout each paragraph, yet silently assign the adjudication of some of them to the Commission. A more reasonable inference is that even though only some of the paragraphs create crimes, Congress intended the violations encompassed by each of them—including § 706(a)—to be adjudicated in Superior Court.[128]

With respect to § 706(a), that inference is further bolstered by the provisions of the Public Utilities Act that address specifically how the Commission may enforce its orders for discovery or disclosure of documents and information.[129] D.C.Code § 34–905(a), authorizing the Commission to order a public utility to produce documents and records kept outside the District of Columbia, specifies that "[a]ny public utility failing or refusing to comply with any order or subpoena shall for each day it shall so fail or refuse forfeit and pay to the District of Columbia the sum of $100, *to be recovered in an action to be brought in the name of said District.*" (Emphasis added.) And D.C.Code § 34–918, which generally empowers the Commission to compel discovery of records, documents and testimony, provides that "[i]n case of disobedience" to any Commission order or subpoena, *"it shall be the duty of the Superior Court ... to compel obedience* by attachment proceedings for contempt, as in the case of disobedience of the requirements of a subpoena issued from such court or a refusal to testify therein." (Emphasis added.) These directives to the Commission to proceed in court in order to enforce routine discovery orders and obtain monetary penalties for their violation manifest Congress's unwillingness to grant the Commission the power to be its own enforcer. Put another way, it is hardly likely that Congress granted the Commission sweeping power in § 706(a) to impose (rather stiff) penalties for violating *any* of its orders when Congress specified a judicial route for the Commission to enforce orders merely requiring regulated entities to produce documents.

■ Furthermore, no party has advanced, and we have not found, any legislative history for the D.C. Public Utilities Act suggesting § 706(a) was intended to be adjudicated by the Commission.[130] Indeed, we can draw the opposite inference

---

**128.** It is true that the penalties in Title 34 are cumulative and the imposition of one does not bar the imposition of another. D.C.Code § 34–711 (2001). Furthermore, § 706(a) suggests that any of the crimes Congress created elsewhere also could be punished through its forfeiture provision. But we do not think that indicates one way or the other which body has adjudicatory authority over violations of § 706(a). In at least one other statute, Congress created both criminal penalties and a forfeiture statute which created a civil action. *See Stockwell v. United States,* 80 U.S. (13 Wall.) 531, 532, 20 L.Ed. 491 (1871) (discussing customs statute).

**129.** While we highlight the significance of these statutory provisions, we do not reach the question (the first one raised in our supplemental briefing order) whether they precluded the Commission's resort in this case to § 706(a).

**130.** The Commission points to a passing remark in one Senate Report accompanying the Act, stating that "[t]he present bill recognizes the demand [for a public utilities law] as a just one and attempts to meet every possible contingency that exists by placing in the hands of the commission the power to regulate thoroughly all the public utilities of the District." S. Rep. 62–300, at 2 (1912), *microformed on* CIS No. 6120 S.Rp. 300 (Cong. Info.Serv.). That vague statement does not necessarily mean, as the Commission would have it, that Congress intended to confer the power in question here; it might mean only that Congress thought that the powers with which it endowed the Commission were entirely adequate to its task.

from Congress's silence.[131] Considering the utilities' strenuous resistance some twenty years later when Congress abrogated the right to retry the Commission's conclusions in equity,[132] if Congress had initially intended § 706(a) to confer adjudicatory authority on the Commission, one would expect to see some mention of it in the legislative history. On the other hand, our reading is supported by two subsequent amendments to the D.C. Public Utilities Act and their respective legislative histories. Certainly, to the extent that later Congresses purported to construe § 706(a), we must take their views with a grain of salt. "[S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress."[133] Each enactment, though, was to some extent predicated on Congress's understanding that § 706(a) does *not* enable the Commission to impose fines itself, giving Congress's interpretation slightly more weight than it would otherwise have.[134]

First, in 1939 Congress enacted D.C.Code §§ 34–731 (2001) and –732 (2001). Those provisions allow the violation of a Commission order to be prosecuted as a misdemeanor. While neither provision sheds direct light on what body has the authority to adjudicate alleged violations of § 706(a), the legislative history makes clear that Congress passed the law in part because it found insufficient the fact that "certain orders of the Public Utilities Commission ... are now enforceable *only by civil action* to recover a penalty."[135]

Second, in 1971 Congress enacted D.C.Code § 34–706(b) (2001) to enable the District of Columbia to comply with the requirements of state certification set out in the Natural Gas Pipeline Safety Act of 1968.[136] According to the Pipeline Safety Act, local jurisdictions could enforce natural gas safety rules themselves only if (among other qualifications) "the law of the State makes provision for the enforcement of the safety standards of such State

131. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 490, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("The history is ... silent on this point and contains nothing to contradict the import of the language appearing in the statute. Had Congress intended to impose this novel requirement, there would have been at least some mention of it in the legislative history, even if not in the statute.").

132. *See generally Procedural Changes Hearing, supra* note 43.

133. *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (internal quotation marks omitted). *See also Doe v. Chao*, 540 U.S. 614, 626–27, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004) ("[S]ubsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." (internal quotation marks omitted)). This principle is part of the reason we must reject arguments by the Commission and OPC from language in two recent committee reports of the D.C. Council. The other

reason is that the Council's reports are vague—neither addresses the question of adjudicatory authority under § 706(a); they merely characterize it as permitting the "levying of fines" (we agree; it does) or as the Commission's "general penalty provision" (we agree; it is).

134. *Cf. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (drawing distinction between subsequent legislation that declares the intent of an earlier statute and subsequent legislative history, such as a "statement in a conference report"). Furthermore, if nothing else, Congress's interpretation of § 706(a) presumably tells us how the law was *generally* interpreted at that time, even if we cannot draw from that fact that the interpretation is correct.

135. H.R.Rep. No. 75–383, at 2 (1937) (emphasis added).

136. *See* H.R.Rep. No. 92–260, at 2 (1971) [hereinafter Pipeline Amendments Act House Report].

agency by way of injunctive and monetary sanctions substantially the same as are provided" in the Pipeline Safety Act.[137] The model "monetary sanctions" in the Pipeline Safety Act could be imposed by the Secretary of Transportation.[138] In bringing the District in line with the Pipeline Safety Act's requirements, Congress remarked, "[t]he District of Columbia already has injunctive powers *but no civil penalty provisions.*"[139] It went on to create a new law providing that "[a]ny person who violates any regulation issued by the Commission governing safety of pipeline facilities and the transportation of gas, shall be subject to a civil penalty as set forth in the Commission's regulations."[140] If Congress had read § 706(a) the same way the Commission does, that new provision would have been unnecessary; it could merely have raised the level of the fine to match that in the Pipeline Safety Act.

## IV. Conclusion

We hold that, notwithstanding the statutory exhaustion of remedies requirement, we have jurisdiction to consider whether the Commission had the legal authority to adjudicate WGLC's alleged violation of its orders and impose a forfeiture pursuant to D.C.Code § 34–706(a). We hold that the Commission does not have that authority. Consequently, its order-and the attendant $350,000 forfeiture—cannot stand.

*Reversed.*

Opinion for the court by Associate Judge GLICKMAN.

Concurring opinion by Senior Judge FARRELL at page 50.

FARRELL, Senior Judge, concurring:

I join Judge Glickman's opinion—a masterful piece of scholarship—for the court. On the merits, *i.e.,* on whether D.C.Code § 34–706(a) empowers the Commission itself to adjudicate the violation that WGLC was accused of here or instead creates a cause of action enforceable in court, the court is undeniably correct. Not only does its historical analysis of the statutory words "forfeit and pay" convincingly favor the latter meaning, but the statute as a whole leaves no room for doubt that even on such mundane (or housekeeping) matters as compliance with a Commission discovery order, the legislature meant the agency to have to seek a court's aid to enforce its procedures. *See, e.g.,* D.C.Code § 34–905(a) ("Any public utility failing or refusing to comply with any . . . subpoena [including for production . . . of . . . papers . . . or records"] shall for each day it shall so fail or refuse "forfeit and pay to the District of Columbia the sum of $100, to be recovered in an action to be brought in the name of said District.").

I also join the court's conclusion that we have jurisdiction to consider this question, although that point is an exceedingly close one. Conceptually and as a matter of policy, it is hard for me to imagine why Congress would have conditioned the

---

137. Natural Gas Pipeline Safety Act of 1968, § 5(a), Pub.L. No. 90–481, 82 Stat. 720, 723 (1968) (codified at 49 U.S.C. § 1674(a) (1971)). A statute to the same effect is presently codified at 49 U.S.C. § 60105(b)(4) (2006).

138. *See* Natural Gas Pipeline Safety Act, *supra* note 137, § 9, 82 Stat. at 725–26.

139. Pipeline Amendments Act House Report, *supra* note 136, at 2–3 (emphasis added). The Senate Report contains identical language. S. Rep. 92–325, at 3 (1971).

140. D.C.Code § 34–706(b).

court's authority to entertain an appeal on the prior filing of an administrative application to reconsider that need bear no relation to the issue the court then considers on appeal. In the face of statutory language seemingly meant to give the Commission first crack at all issues, it is something of a strain to hold, as we do, that *any* application to reconsider—even a *pro forma* one—triggers the court's power to raise on its own issues of Commission "authority" not presented to the agency. Moreover, the distinction we invoke between "jurisdictional" challenges to that body's exercise of authority—raisable so long as (unrelated) reconsideration was sought before it—and all others, which must be exhausted, is not reflected in the statute and, as we implicitly acknowledge in the discussion, a slippery one depending largely on judicial self-restraint. What may not impress one panel of the court as sufficiently an issue of wrongful "arrogat[ion of] power" by the agency may impress another, more generously disposed, as rising to that level.

Judge Glickman nevertheless makes a persuasive case for concluding that, if Congress had meant to deny the court all power to ignore a failure to exhaust an issue in Commission cases, it would have said so explicitly, as it has in other contexts. This court's authority to overlook a failure to present a "jurisdictional" issue to the agency has been affirmed by decisions such as *F.W. Woolworth Co. v. District of Columbia Bd. of Appeals & Review*, 579 A.2d 713, 715 (D.C.1990), and our analogous authority to review claims not preserved in the trial court to prevent a "miscarriage of justice" is well-settled. Thus, I cannot bring myself to say that, even though WGLC's appeal is properly before us by reason of the reconsideration it sought, we must close our eyes to an instance of action plainly exceeding the Commission's power.